613 P.2d 620

**WEDGEWOOD INVESTMENT CORP.,**
an Arizona Corporation, dba Nassers
Fiat-International, Appellant,

v.

**INTERNATIONAL HARVESTER
COMPANY, a Delaware
Corporation, Appellee.**

No. 1 CA–CIV 3692.

Court of Appeals of Arizona,
Division 1, Department B.

May 10, 1979.

Rehearing Denied Jan. 4, 1980.

Review Denied Jan. 22, 1980.

Neville, Lalliss & Tanner, P. C. by Robert
T. Neville, Phoenix, for appellant.

Jennings, Strouss & Salmon by John S. Hobbs, Leo R. Beus and Stephen C. Earl, Phoenix, for appellee.

## OPINION

HAIRE, Judge.

The issues raised on this appeal from a summary judgment require that this Court determine whether the performance of an agreement between the appellant-dealer (referred to herein as "Nassers") and the appellee-manufacturer (International Harvester) would be illegal as a per se antitrust violation, and, if so, whether that illegality would preclude the enforcement of Nassers' claim for damage for the alleged breach thereof by International Harvester. The trial court decided both of these issues in favor of International Harvester.

Reviewing first those facts which, for the purpose of the summary judgment proceeding, were not in dispute, we find that Nassers was, at all relevant times, an authorized International Harvester dealer in both new vehicles and parts. Within seven blocks of its dealership in Mesa, Arizona, was another dealer, Central Truck, which was also an authorized International Harvester parts dealer. These two businesses had coexisted in direct competition in the sale of International Harvester parts from the time Nassers first acquired its dealership in 1969.

On several occasions prior to the events leading to this action Nassers had attempted to have International Harvester do something about the price-cutting activities of Central Truck. Central Truck sold International Harvester parts at a lesser price than Nassers. Nassers either would not, or could not, due to its overhead, sell at the same price as Central Truck, although both entities purchased the parts from International Harvester at the same price.

In September of 1973 International Harvester announced that its own branch store in Phoenix, Arizona would no longer stock parts for, sell or service the light line of vehicles it manufactured. International Harvester representatives approached Nassers with a request that Nassers purchase the parts in stock for such vehicles from the discontinued branch store. This proposed purchase of the parts by Nassers was discussed at a meeting in October of 1973. Also, Nassers' plans for improving and expanding its facilities were discussed. An oral agreement was reached that, if Nassers would expand and improve its facility considerably beyond the improvements it had been contemplating, International Harvester would, in turn, exercise a 30 day cancellation clause in its franchise agreement with Central Truck, which was the only other International Harvester parts distributor in Mesa.

In reliance upon this oral agreement, later acknowledged in letters between Nassers and International Harvester, and in expectation of greatly increased parts sales, Nassers set about improving its facility. Additional acreage was purchased and new buildings were constructed. Upon the completion of the new facilities International Harvester sent Central Truck a letter cancelling its parts franchise effective November 21, 1974.

On November 1, 1974, the attorney for Central Truck wrote to International Harvester objecting to the cancellation and threatening an antitrust action if the cancellation was not rescinded. After consulting with its counsel, International Harvester rescinded the cancellation of Central Truck's parts franchise. After the rescission, counsel for Nassers threatened legal action to recover the expenditures made in improving its facility and for punitive damages. In an inter-office memo of December 5, 1974, International Harvester acknowledged its dilemma and decided that it was in a stronger position to defend the Nassers' action than that of Central Truck, and therefore adhered to its rescission of the cancellation. This suit followed.

Nassers, by its complaint, alleged the terms of the agreement and International Harvester's breach. On this basis it sought recovery for the amount spent in expanding its business. Nassers further alleged that the agreement was procured by fraud on

the part of International Harvester (claiming that International Harvester never intended to keep its bargain) and sought punitive damages in the amount of $10,000,-000. International Harvester answered denying the allegations of fraud and asserted affirmatively that its agreement with Nassers was illegal because it violated the antitrust laws and that, in light of its illegality, no action predicated upon that agreement could be entertained by the court.

After numerous depositions, International Harvester moved for summary judgment pursuant to Rule 56 of the Arizona Rules of Civil Procedure, attaching an affidavit of a local expert in the field of antitrust litigation who, after listing the purportedly established facts, stated that, in the writer's opinion, the agreement between International Harvester and Nassers was a per se violation[1] of § 1 of the Sherman Antitrust Act.[2]

Nassers replied by claiming that the agreement did not violate the antitrust laws and that, even if it did, the issue of illegality would have to be determined by the "rule of reason".[3] Therefore, Nassers' argument continues, since the application of the "rule of reason" would require that numerous factual determinations be made by a jury, summary judgment would not be appropriate. Nassers filed an affidavit in opposition to the motion for summary judgment alleging that, contrary to International Harvester's assertions, Nassers' rationale for entering into the agreement was not to eliminate its price-cutting competition. The affidavit did concede, however, that James Nasser, the affiant and principal of the appellant, "had not been pleased with Central Truck's pricing practices in the Mesa area. . . ." The affidavit also affirmatively asserted that pricing had not been discussed in the negotiations between Nassers and International Harvester during September and October of 1973; that the discussions which culminated in the agreement by Nassers to upgrade its facilities had resulted from an approach by International Harvester representatives; that the International Harvester representatives were told that Nassers would not upgrade its facilities unless it could have an exclusive dealership in the Mesa area; and that accordingly International Harvester representatives had agreed to cancel Central Truck at the completion of the upgrading of Nassers' facilities.

International Harvester asserts that Nassers' statement that price-cutting was not the reason for requesting the cancellation of Central Truck is in direct conflict with the sworn testimony of James Nasser and other Nasser principals. It further argues that the depositions show that the price-cutting was in fact the sole reason for Nassers' request that the parts franchise agreement with Central Truck be cancelled.

The statutory provisions relevant to our consideration of the alleged antitrust violations are § 1 of the Sherman Act and its counterpart in Arizona, A.R.S. § 44–1402. These provide in relevant part:

---

1. Per se violations arise from "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549 (1958).

2. Nassers also attached an affidavit by another expert who, assuming slightly different facts, reached the conclusion that the agreement was not a per se violation. Since both affidavits represent mere conclusions of law, we have not considered them in our resolution of this appeal.

3. "Since the early years of this century a judicial gloss on this [Sherman Act] language has established the 'rule of reason' as the prevailing standard of analysis. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Under this rule, the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anti-competitive." *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–8, 53 L.Ed.2d 568, 580 (1977). (Footnote omitted).

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

15 U.S.C. § 1

"A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within the state, is unlawful."

A.R.S. § 44–1402

The Arizona legislature clearly intended to strive for uniformity between federal and state antitrust laws. A.R.S. § 44–1412 provides in part:

"It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."

Inasmuch as the major part of case law in the antitrust area has been developed in the federal courts, our primary focus will be upon opinions from those courts.

■ The major issue in this case is whether that part of the parties' agreement calling for the cancellation of Central Truck's franchise constituted a "per se" violation of the antitrust laws. Before considering this issue we note that it is clearly established that neither a federal nor a state court will enforce a contract that requires conduct made unlawful by the Sherman Act. *See, e. g., Continental Wall Paper Co. v. Louis Voight & Sons Co.,* 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909); *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753 (6th Cir.), *cert. denied* 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965); *Whipple v. Shamrock Foods Co.,* 26 Ariz.App. 437, 549 P.2d 217 (1976); *Harold Butler Enterprises # 97, Inc. v. Vanlandingham,* 264 Or. 414, 505 P.2d 1149 (1973); *but see Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

■ International Harvester recognizes that the summary judgment entered by the trial court can be sustained only if the undisputed facts show that its agreement with Nassers was a per se violation of the antitrust laws, conclusively presumed to be unreasonable and therefore illegal without the necessity of an evidentiary inquiry into the precise harm caused or the business excuse for its use. The consequence of a determination that an agreement falls within one of the per se categories of antitrust violation is that it concludes the judicial inquiry. There are no defenses. Regardless of how reasonable the parties' behavior might have been in the particular case, the rule of reason is inapplicable and mitigating circumstances are not taken into account.

As an initial basis for the claimed per se illegality, International Harvester contends that any agreement entered into between a supplier (here, International Harvester) and a dealer (here, Nassers) under which the supplier agrees in advance to terminate a competing dealer is a per se violation. This is essentially an argument that the agreement is illegal without the necessity of any showing of a price stabilization motivation. In International Harvester's view, the bare fact that the refusal to deal results from an advance agreement between the supplier and the dealer brings the agreement within a per se category, motivation being immaterial. International Harvester characterizes such an agreement as a "classic concerted refusal to deal, sometimes called a group boycott" and places reliance upon the decision in *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In our opinion, International Harvester's reliance upon *Klor's* is misplaced. *Klor's* did not involve a mere vertical agreement wherein a supplier agreed with one of its dealers to discontinue sales to a competing dealer. Rather, the claim in *Klor's* was that ten different suppliers conspired amongst themselves and with the defendant-dealer (Broadway-Hale Stores) not to sell to Klor's or to sell only at discriminatory prices. This situation constituted a true concerted refusal to deal. The trial court in *Klor's* had granted summary judgment for all of the defendants. The Supreme Court stated that:

"The holding, if correct, means that unless the opportunities for customers to

buy in a competitive market are reduced, a group of powerful businessmen may act in concert to deprive a single merchant, like Klor, of the goods he needs to compete effectively.

\*    \*    \*    \*    \*    \*

"Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality.' " 359 U.S. at 210, 212, 79 S.Ct. at 708–9, 3 L.Ed.2d at 743–5 (Footnotes and citations omitted).

Of particular importance to International Harvester's arguments here, the court further noted:

"Plainly the allegations of this complaint disclose such a boycott. This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. [Alleged] in this complaint is a wide combination consisting of manufacturers, distributors and a retailer." 359 U.S. at 212–3, 79 S.Ct. at 709–10, 3 L.Ed.2d at 745 (Footnotes omitted).

As counsel for Nassers point out, International Harvester seems to confuse the distinction between horizontal and vertical restraints. While horizontal agreements among competitors have almost universally been held to be per se violations of the antitrust act, vertical restrictions between manufacturers and retailers are generally, with certain exceptions,[4] dealt with under the "rule of reason". *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). *See also White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) in which the court specifically noted the *Klor's* involved horizontal restraints.

Nassers, on the other hand, relies on *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418 (D.C.Cir.) *cert. denied* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), and *Schwing Motor Co. v. Hudson Sales Corp.*, 138 F.Supp. 899 (D.Md.), *aff'd*, 239 F.2d 176 (4th Cir. 1956), *cert. denied* 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957) for the proposition that an agreement resulting from a request by a dealer to a supplier that a competing dealer be terminated, does not, in the absence of a showing of price stabilization motivation, constitute a per se violation. International Harvester acknowledges that these authorities strongly support Nassers' position, but argues that both were decided prior to *Klor's*, and therefore should not be considered persuasive. We have previously indicated that in our opinion *Klor's* is not applicable to the type of agreement presented here. Other courts have also specifically held *Klor's* not applicable to similar fact situations. *See, e. g., Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2nd Cir.) *cert. denied* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Eastcoast Equipment Co. v. Harnischfeger Corp.*, 354 F.Supp. 335 (E.D.Pa.1973); *Potter's Photographic Applications Co. v. Ealing Corp.*, 292 F.Supp. 92 (E.D.N.Y.1968). The principle involved is well summarized in an annotation entitled "Refusals to Deal as Violations of the Federal Antitrust Laws", 41 A.L.R. Fed. 175, 263–4 (1979) as follows:

"The general antitrust rule applicable to a switch of one business relationship to another business relationship has been stated by several federal courts to be that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to ˙B and such a transfer does not violate the antitrust laws even though B may have solicited the transfer and *even though the seller and B may have reached agreement prior to the seller's termination of its relationship with A.*" (Emphasis added).

*Universal Brands, Inc. v. Philip Morris, Jr.*, 546 F.2d 30 (5th Cir. 1977); *Joseph E. Sea-*

---

4.  *See, e. g., Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (tying arrangements);

*United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967) (price fixing).

*gram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969); *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237 (D.N.J.1976); *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.*, 403 F.Supp. 643 (E.D.Pa.1975), aff'd mem., 565 F.2d 154 (3d Cir. 1977); *Marder v. Conwed Corp.*, 378 F.Supp. 109 (E.D.Pa.1974); *Peerless Dental Supply Co. v. Weber Dental Manufacturing Co.*, 283 F.Supp. 288 (E.D. Pa.1968). We therefore hold that the bare fact that the agreement between International Harvester and Nassers required the cancellation of the Central Truck franchise does not bring that agreement within the "per se" preclusion category of the antitrust laws.

We now consider International Harvester's alternative contention that because the agreement to cancel Central Truck was based upon price stabilization motivations, it constituted a violation within the per se category. The legal basis for this alternative contention is sound. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir., 1979). However, it must be kept in mind that summary judgment cannot be granted if there are disputed issues of material fact. Ariz.R.Civ.P. 56(c); *Olson v. Staggs-Bilt Homes, Inc.*, 23 Ariz.App. 574, 534 P.2d 1073 (1975). Here, while there is strong and persuasive evidence that the agreement to cancel Central Truck's franchise had its genesis in price stabilization motivations, and therefore constitutes a per se antitrust violation, we cannot say that there was a complete absence of evidence from which a trier of fact might conclude otherwise. In this connection, we note that International Harvester has not pointed to

any direct evidence in the record showing that at the specific time of the making of the agreement to cancel Central Truck there were any discussions relating to pricing considerations. Rather, the evidence relating to the actions of the parties at that time is susceptible to the interpretation that the agreement resulted from International Harvester's decision to change its marketing practices in the area with resulting pressures by International Harvester on Nassers to upgrade its facilities, a move that Nassers refused to make without some assurance of an exclusive [5] marketing area so as to make such upgrading economically feasible. Considered in such a light, the agreement would be subject to antitrust scrutiny under the "rule of reason" rather than the "per se" rule as urged by International Harvester. Since neither party has urged that summary judgment would have been appropriate under the "rule of reason" standard, we find that the trial court erred in granting summary judgment for International Harvester on Nassers' claim for breach of contract.[6]

International Harvester has brought to the Court's attention the fact that Nassers has requested punitive damages in connection with its breach of contract claim. For the guidance of the trial court in any further proceedings which might occur in this matter, we hold that an award of punitive damages would not be proper. *See Continental Bank v. Evans*, 107 Ariz. 378, 489 P.2d 15 (1971).

[4] We now direct our attention to Nassers' claim for fraud, and hold that the trial court correctly granted summary judgment on that claim. Without going into a detailed factual discussion, suffice it to say that the record shows no support for many

---

5. The agreement alleged by Nassers was not a true exclusive territory agreement within the ordinary sense of that term. However, if performed by International Harvester, the agreement would have resulted in a de facto exclusive selling area for Nassers, and we see no distinction to be made in assessing its anticompetitive effects.

6. We have set forth in this opinion only those facts pertinent to the specific issues raised on appeal. This opinion is not to be construed as a holding that, under all the circumstances presented, a trier of fact would or would not have been justified in finding that the restrictive provisions of the subject agreement constituted an unreasonable restraint on competition and thus a violation of the "rule of reason".

of the elements necessary for the establishment of an actionable fraud claim. *See Nielsen v. Flashberg*, 101 Ariz. 335, 419 P.2d 514 (1966). Under the state of the record presented in the trial court, International Harvester's motion for summary judgment was properly granted on the fraud claim. *See Biondo v. General Motors Corporation*, 5 Ariz.App. 286, 425 P.2d 856 (1967).

The judgment on the fraud claim is affirmed. The judgment on the breach of contract claim is reversed, and the matter is remanded for further proceedings consistent with this opinion.

OGG, C. J., Division 1, and SCHROEDER, J., concur.

### SUPPLEMENTAL OPINION

HAIRE, Judge.

On May 10, 1979, this Court filed its opinion in this matter reversing that portion of the trial court's judgment entered in favor of the defendant manufacturer (International Harvester Company) on plaintiff-appellant's breach of contract action. The trial court's judgment was based upon the premise that performance of the contract would have constituted a per se violation of state and federal antitrust laws and that, therefore, the contract was illegal and could not be enforced. After considering the motion for rehearing filed by appellee and the arguments of *amicus curiae*,[1] we are now convinced that we erred in our original opinion, and that the judgment entered by the trial court must be affirmed.

In our prior opinion we rejected International Harvester's argument that *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) required an automatic "per se" classification of all vertical restraint agreements constituting concerted refusals to deal.[2] In support of

our rejection of that argument, we relied upon the United States Supreme Court's reasoning in *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) as well as numerous other decisions generally involving exclusive dealing agreements which required the supplier's termination of one dealer and the substitution of the contracting new dealer in place of the terminated dealer. We remain of the opinion that our reasoning was sound in that regard and that *Klor's* does not require per se violation classification for all vertical restraint agreements involving refusals to deal entered into between a supplier and a dealer. Rather, in our opinion, the principle to be gleaned from *Klor's* is that an agreement involving vertical restraints may on the uncontroverted facts demonstrate such anti-competitive effects that per se treatment is required. As stated in our original opinion, an agreement constitutes a per se violation when, because of its pernicious effect on competition and lack of any redeeming virtue it is conclusively presumed to be unreasonable and therefore illegal.

Proceeding now to a consideration of the agreement in question with the foregoing standard in mind, counsel for *amicus curiae* has pointed out that there are important factual distinctions which mitigate against the strong reliance which we placed on the exclusive-dealing decisions cited in our prior opinion. Those decisions involved supplier-initiated agreements calling for the substitution of a new dealer for an existing dealer. Thus there was no lessening of existing competitors in the marketplace. This is unlike the agreement presented here which would require that one of two existing competitors be eliminated, thereby leaving only one and having a definite anti-competitive effect. Further, it is uncontroverted here

---

1. After the filing of our opinion, the State of Arizona, acting through its Attorney General, filed a motion for permission to participate in this matter as *amicus curiae* in support of the motion for rehearing. We have granted that motion, and have considered the arguments made by the state in arriving at the disposition set forth in this supplemental opinion.

2. International Harvester contended that *Klor's* mandated per se classification in all instances where the refusal to deal with a specific dealer resulted from an advance agreement between the supplier and another dealer.

that the contemplated cancellation of the competing dealer's franchise was not the result of supplier-initiated unilateral action seeking to compete with other manufacturers by imposing reasonable vertical restraints. Rather, the proposed cancellation of Central Truck's franchise was initiated by the competing dealer, Nassers. As stated in *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir. 1979):

"When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. This would appear to be the rationale of the *GTE Sylvania* decision. However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.

"The importance of the horizontal nature of this arrangement is illustrated by *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Although General Motors, the manufacturer, was seemingly imposing vertical restraints when it pressured recalcitrant automobile dealers not to deal with discounters, the Supreme Court noted that in fact these restraints were induced by the dealers seeking to choke off aggressive competitors at their level, and found a *per se* violation, rejecting the suggestion that only unilateral restraints were at issue. So here, if United and Lappin [the manufacturer and its representative] acted at Famous' [dealer's] direction, both the purpose and effect of the termination was to eliminate competition at the retail level, and not, as in *GTE Sylvania*, to promote competition at the manufacturer level. Accordingly, the pro-competitive redeeming virtues so critical in *GTE Sylvania* may not be present here." (Footnote omitted). 595 F.2d at 168

Likewise, under the facts before this Court, since the agreement to cancel Central Truck's franchise was initiated from the dealer level, both the purpose and effect was to eliminate competition at the retail level, without any redeeming virtue which might have existed had the proposed cancellation emanated from the manufacturer based upon the manufacturer's unilateral efforts to promote competition at the manufacturer's level.

There is still another factor which upon reconsideration contributes to our decision that the agreement at hand falls within the per se violation category. In our prior opinion we discussed International Harvester's alternate contention that per se treatment was mandated because the agreement was based upon price stabilization motivations. Although the evidence in that regard was exceedingly strong and persuasive, we held, applying appropriate summary judgment guidelines, that there was some evidence from which a trier of fact might find that there were other non-pricing considerations which ultimately led to the agreement. Assuming that we correctly analyzed the evidence in that regard, nevertheless we now feel that in judging the overall anti-competitive effects of the agreement, our emphasis was misdirected. Regardless of Nassers' ultimate motivations which eventually led to the International Harvester's agreement to cancel Central Truck's franchise, it is uncontroverted that performance of that cancellation agreement would have resulted in universally recognized anti-competitive consequences, the complete elimination of a price-cutting competitor. In our opinion the addition of this latter factor serves to differentiate the agreement at hand from those considered in *Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418 (D.C.Cir.), *cert. denied* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957) and *Schwing Motor Co. v. Hudson Sales Corp.*, 138 F.Supp. 899 (D.Md.), *aff'd*, 239 F.2d 176 (4th Cir. 1956), *cert. denied* 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957), cited in our original opinion.

In summary, when consideration is given to the fact that the proposal to cancel Central Truck's franchise was initiated by a competing dealer and not as the result of unilateral action by the supplier, International Harvester; and that performance of that agreement would result, not only in elimination of an existing competitor, but also in the elimination of the only existing price competition, we must conclude that because of its pernicious effect on competition and lack of any redeeming virtue, the agreement to cancel constituted a per se violation of the antitrust laws. Therefore, the trial judge did not err in finding that the agreement was unenforceable.

Inasmuch as all other issues on appeal were concluded in appellee's favor in our prior opinion filed in this matter, the judgment entered in the trial court is affirmed.

OGG, C. J., Division 1, and SCHROEDER, J., concur.