47 P.3d 1119

**BUNKER'S GLASS COMPANY, an Arizona corporation, on Behalf of Themselves and All Others Similarly Situated, Plaintiff–Appellant,**

v.

**PILKINGTON PLC, a foreign corporation, Pilkington Libbey–Owens–Ford Co. Inc., a foreign corporation, PPG Industries, Inc., a foreign corporation, Ford Motor Co., a foreign corporation, Guardian Industries Corporation, a foreign corporation, and AFG Industries, Inc., a foreign corporation, Defendants–Appellees.**

No. 1 CA–CV 01–0046.

Court of Appeals of Arizona, Division 1, Department A.

March 28, 2002.

As Corrected June 28, 2002.

---

* Due to a vacancy on the court, pursuant to article VI, § 3 of the Arizona Constitution, the Honorable Edward C. Voss, Judge of the Court of Appeals, Division One, was designated to sit on this case.

Davis, McKee & Forshey, P.C. By Jeffrey A. McKee, Phoenix, and Law Offices of George A. Barton, P.C. By George A. Barton, Kansas City, Missouri, and Law Office of Thomas H. Brill By Thomas H. Brill, Leawood, Kansas, Attorneys for Plaintiff–Appellant.

Karp, Heurlin & Weiss, P.C. By Bruce Heurlin, Tucson, Attorneys for Defendants–Appellees Pilkington plc and Guardian Industries Corp.

Pepper Hamilton LLP By Laurence Z. Shiekman, Philadelphia, Pennsylvania, Attorneys for Defendants–Appellees Pilkington plc and Pilkington Libbey–Owens–Ford Company.

Arnold & Porter By Alexander E. Bennett, Washington, DC, Attorneys for Defendant–Appellee Guardian Industries Corp.

Bryan Cave LLP By Lawrence G.D. Scarborough, Kelly A. O'Connor, Phoenix, and Cravath, Swaine & Moore By Paul M. Dodyk, New York, New York, Attorneys for Defendant–Appellee PPG Industries, Inc.

Snell & Wilmer, LLP By Daniel J. McAuliffe, Phoenix, and O'Melveny & Myers By John H. Beisner, Neil K. Gilman, Washington, DC, Attorneys for Defendant–Appellee Ford Motor Company.

Squire, Sanders & Dempsey, L.L.P. By Donald A. Wall, Phoenix Attorneys for Defendant–Appellee AFG Industries, Inc.

Janet Napolitano, Arizona Attorney General By Timothy A. Nelson, Special Counsel, David D. Weinzweig, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae State of Arizona.

Goodwin Raup P.C. By Rudolph J. Gerber, Brian Michael Goodwin, Marty Harper, Lori V. Berke, Kelly J. Flood, Phoenix, Attorneys for Amicus Curiae Charles I. Friedman, P.C.

## OPINION

WEISBERG, Judge.

¶ 1 In this appeal, we consider whether an indirect purchaser of goods may bring an action to recover damages resulting from the alleged price-fixing by the manufacturers of those goods. For the reasons that follow, we hold that such an action is allowed under Arizona law.

## BACKGROUND

¶ 2 Flat glass production is a multibillion dollar industry in the United States. *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 475 (W.D.Pa.1999). The appellees are the principal manufacturers of all flat glass products sold in the United States, including Arizona.

¶ 3 "Flat glass" refers to glass products manufactured through the float process [1] and includes glass that is transparent, opaque, translucent, or reinforced. *Id.* at 475 n. 6. Fabricated flat glass is used primarily for glass windows and doors in residential and commercial structures and for automobile windshields and windows. *Id.* at 476.

¶ 4 Appellant Bunker's Glass is a business located in Maricopa County that regularly purchased flat glass products from wholesale distributors. Thus, Bunker's Glass purchased these products indirectly from appellees.

¶ 5 In February 2000, Bunker's Glass filed an antitrust class action complaint against appellees on behalf of itself and all other commercial indirect purchasers of flat glass products in Arizona. In its complaint, brought under Arizona's Antitrust Act, Arizona Revised Statutes ("A.R.S.") *sections 44–1402, –1403, –1408* (1994) and related statutes, it alleged that beginning in August 1991 and continuing for at least four years, appellees entered into a conspiracy to fix the prices of flat glass products sold in the United States, including Arizona.

¶ 6 Bunker's Glass further alleged that as a result of such combination and conspiracy: (1) appellees sold flat glass products to direct purchasers of the products at artificially high and noncompetitive levels; (2) competition for the sale of flat glass products in Arizona was restrained; (3) the artificially high prices for flat glass products were passed on by distributors and wholesalers to Bunker's Glass and other indirect commercial purchasers in Arizona; and (4) Arizona purchasers were damaged in their businesses by having to pay artificially high prices for flat glass products.

¶ 7 Appellees moved to dismiss the complaint, arguing that indirect purchasers lacked standing to recover damages from flat glass manufacturers. They asserted that the rule announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), in which the United States Supreme Court held that indirect purchasers of a product could not sue under federal antitrust laws for damages caused by price-fixing, should be followed in Arizona. The trial court agreed and granted appellees' motion to dismiss.[2]

¶ 8 Bunker's Glass timely appealed from the judgment dismissing its complaint. We have jurisdiction under A.R.S. § 12–2101(B) (1994).

## DISCUSSION

### A. Standard of Review

¶ 9 In reviewing the trial court's dismissal of a complaint for failure to state a claim, we consider the facts alleged in the complaint to be true and will not affirm the dismissal unless we conclude as a matter of law that the plaintiff would not be entitled to relief under any interpretation of the facts.

---

1. In the "float process," a continuous ribbon of molten glass floats on a liquid of greater density than the glass; normally the denser liquid is molten tin. *Flat Glass*, 191 F.R.D. at 475–76 n. 7. The glass is then polished under controlled temperatures and cooled in an annealing oven. *Id.*

2. Although appellees also moved to dismiss the complaint on the alternative ground that it was barred by the applicable statute of limitations, the trial court did not decide that issue. We therefore do not consider it here. *See Jett v. City of Tucson*, 180 Ariz. 115, 123–24, 882 P.2d 426, 434–35 (1994) (appellate court will not address issue not resolved by the trial court).

*Fid. Sec. Life Ins. Co. v. State Dep't of Ins.,* 191 Ariz. 222, 224, ¶ 4, 954 P.2d 580, 582 (1998). We review the legal issues *de novo. Transp. Ins. Co. v. Bruining,* 186 Ariz. 224, 226, 921 P.2d 24, 26 (1996). To the extent that our review involves questions of statutory construction, we are not bound by the trial court's conclusion and need accord it no deference. *Babe's Cabaret v. City of Scottsdale,* 197 Ariz. 98, 101, ¶ 6, 3 P.3d 1018, 1021 (App.1999); *Tobel v. Ariz. Dep't of Pub. Safety,* 189 Ariz. 168, 173–74, 939 P.2d 801, 806–07 (App.1997).

## B. Indirect Purchaser Standing

### 1. Arizona's antitrust laws

▆▆▆▆ ¶ 10 In determining whether Arizona law permits an indirect purchaser to recover for antitrust violations, we first look to the language of the relevant statutes because, when interpreting a statute, we primarily examine its language and give effect to its terms according to their ordinary meanings unless the legislature has provided a specific definition or the context indicates that a term carries a special meaning. *Wells Fargo Credit Corp. v. Tolliver,* 183 Ariz. 343, 345, 903 P.2d 1101, 1103 (App.1995). If it is clear and unambiguous, we give effect to the statutory language without resorting to other forms of statutory construction. *Id.*

¶ 11 Arizona law provides that "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." A.R.S. § 44–1402. Private actions to seek damages for violation of this statute may be brought under A.R.S. § 44–1408(B), which provides:

> A person threatened with injury or injured in his business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it shall increase recovery to an amount not in excess of three times the damages sustained.

A "person" for the purposes of this statute is defined as "an individual, corporation, business trust, partnership, association or any other legal entity." A.R.S. § 44–1401 (1994).

¶ 12 Although, as Bunker's Glass points out, nothing in § 44–1408(B) or any other Arizona antitrust statute indicates that a "person" is limited to one who purchases directly from an alleged antitrust law violator, neither does its language preclude such an interpretation. Nevertheless, the use of the term "person" to include "an individual" supports the view that the legislature intended by this language to extend standing in antitrust cases to individuals who are ultimate users of a product, because the direct purchaser from a manufacturer typically is a business entity that sells the product to another intermediate entity or to an end-user consumer. It is contrary to the common meanings of "person" and "individual" to presume that, even though § 44–1408(B) allows individuals to bring antitrust actions, it does not apply to those individual consumers who are indirect purchasers of a product and confers standing only on intermediate entities like brokerage houses and retail establishments that purchase directly from manufacturers. To adopt such a view would severely limit the application of those terms.[3]

▆▆▆▆ ¶ 13 We also must interpret our state's antitrust law in light of its history, legislative intent, relevant Arizona constitutional provisions, and public policy concerns. We determine the legislature's intent by reading the statute as a whole and by considering its context, subject matter, historical background, consequences, and effects. *State v. Seyrafi,* 201 Ariz. 147, 150, ¶ 13, 32 P.3d 430, 433 (App.2001).

▆▆▆▆ ¶ 14 From the time it became a state, Arizona has included an antitrust statute among its laws. *See* 1912 Ariz. Sess. Laws, ch. 73, §§ 1–11. Also, Arizona's Constitution prohibits any manner of monopolies, trusts,

---

**3.** We acknowledge that even if indirect purchasers are barred from bringing actions under A.R.S. § 44–1408(B), "a person" or "an individual" would likely be the direct purchaser in a situation in which it is the intermediate entities that are conspiring to fix prices. The statutory language of "a person" would have greater effect in that situation.

or price-fixing and declares that the legislature must adopt laws to further this constitutional purpose of banning anti-competitive conduct within this state:

> Monopolies and trusts shall never be allowed in this State and no incorporated company, co-partnership or association of persons in this State shall directly or indirectly combine or make any contract, with any incorporated company, foreign or domestic, through their stockholders or the trustees or assigns of such stockholders or with any co-partnership or association of persons, or, in any manner whatever, to fix the prices, limit the production, or regulate the transportation of any product or commodity.[4] The Legislature shall enact laws for the enforcement of this Section by adequate penalties, and in the case of incorporated companies, if necessary for that purpose, may, as a penalty declare a forfeiture of their franchises.

Ariz. Const. art. 14, § 15.

¶ 15 In 1974, the Arizona Legislature adopted the Uniform State Antitrust Act. *See* 1974 Ariz. Sess. Laws, ch. 26, § 1. Section 44–1408, which was originally adopted as A.R.S. § 44–1418, is based upon section 8 of the Uniform State Antitrust Act. Unif. Antitrust Act § 8, 7C U.L.A. 366 (Master ed.2000). The underlying purpose of the Arizona antitrust act is to establish a "public policy of first magnitude" in furthering a competitive economy. *Murcott v. Best W. Int'l, Inc.*, 198 Ariz. 349, 357, ¶ 43, 9 P.3d 1088, 1096 (App.2000) (quoting *United Nuclear Corp. v. Gen. Atomic Co.*, 93 N.M. 105, 597 P.2d 290, 310 (1979)).

¶ 16 While Arizona's constitutional provision concerning antitrust violations does not contain an explicit statement concerning the rights of indirect purchasers to enforce its provisions, "we must choose an interpretation that will best serve and carry out the apparent goals and policies of those responsible for [its] adoption." *Salt River Project Agric. Improvement & Power Dist. v.*

*Apache County,* 172 Ariz. 337, 342, 837 P.2d 139, 144 (1992); *see also Laos v. Arnold,* 141 Ariz. 46, 47, 685 P.2d 111, 112 (1984) (constitutional provisions are to be construed liberally to carry out the purposes for which they were adopted). Where, as here, there is some doubt as to the meaning or scope of certain statutory language, it is the court's duty to reconcile that language with the corresponding constitutional provision. *See Kilpatrick v. Superior Court of Maricopa County,* 105 Ariz. 413, 416, 466 P.2d 18, 21 (1970); *see also Frye v. S. Phoenix Volunteer Fire Co.,* 71 Ariz. 163, 170–71, 224 P.2d 651, 656 (1950) (statutes must be interpreted in harmony with the constitution).

¶ 17 It is evident from the text of Article 14, Section 15 of our constitution that its purpose is to protect consumers by prohibiting certain types of anti-competitive conduct, including price-fixing. This statement of constitutional purpose comports with the assertions of courts regarding the reasons for antitrust laws. For example, the court in *Premier Electrical Construction Company v. National Electrical Contractors Association,* 814 F.2d 358, 368 (7th Cir.1987), noted that "[t]he principal purpose of the antitrust laws is to prevent overcharges to consumers."

¶ 18 Given the consumer protection purpose of Arizona's constitutional antitrust provision and the strong statements against anti-competitive conduct that it contains, any Arizona statutes adopted pursuant to this provision must be liberally construed to carry out the purpose of protecting consumers from price-fixing agreements. Interpreting A.R.S. § 44–1408(B) in this light impels the conclusion that consumers are best protected when indirect purchasers are permitted to maintain antitrust actions against members of alleged price-fixing conspiracies. To do otherwise would frustrate the intent of Article 14, Section 15 of the Arizona Constitution.

---

4. We disagree with Bunker Glass's interpretation of the "directly or indirectly" language in the constitution. This language prohibits business entities from "directly or indirectly" combining or making contracts to fix prices, limit the production, or regulate the transportation of any product or commodity. It does not address whether the illegal conduct affects purchasers directly or indirectly.

## 2. Effect of federal antitrust law

¶ 19 In their motion to dismiss, appellees argued, and the trial court agreed, that Arizona courts should apply federal antitrust case law, based upon federal antitrust statutes, to preclude Arizona indirect purchasers from suing to recover damages suffered as a result of violations of Arizona's antitrust statutes. Appellees relied upon *Illinois Brick Company*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), to reach this result.

¶ 20 In *Illinois Brick*, the State of Illinois, on its own behalf and on behalf of 700 local governmental entities, sued manufacturers and distributors of concrete block under section 4 of the Clayton Act,[5] alleging that the defendants had conspired to fix prices in violation of section 1 of the Sherman Act.[6] *Id.* at 726–27, 97 S.Ct. 2061. The manufacturers sold the block to masonry contractors who were hired by general contractors to construct buildings using the block. *Id.* at 726, 97 S.Ct. 2061. The buildings were then sold to state and governmental entities. *Id.*

¶ 21 The United States Supreme Court held that the plaintiffs, who were indirect purchasers of concrete block, were not parties injured in their business or property for purposes of the federal antitrust laws. *Id.* at 728–29, 97 S.Ct. 2061. The Court relied on the earlier case of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), as the basis for its decision. In *Hanover Shoe*, the Court had held that an antitrust violator could not avoid judgment in favor of a direct purchaser by showing that the purchaser had not been injured because it had "passed on" the illegal overcharge to its own customers. *Id.* at 494, 88 S.Ct. 2224.

¶ 22 In *Illinois Brick*, the plaintiffs sought to use the pass-on theory offensively, arguing that they were injured parties because the illegal overcharge was passed on to them through intermediate distribution channels. 431 U.S. at 726, 97 S.Ct. 2061. The Court concluded that if the pass-on theory could not be used defensively by an antitrust violator against a direct purchaser, it also could not be used offensively by an indirect purchaser against an alleged violator. *Id.* at 728–29, 97 S.Ct. 2061. It reasoned that allowing the use of the pass-on theory offensively but not defensively would create a serious risk of multiple liability for defendants. *Id.* at 730–31, 97 S.Ct. 2061. The *Illinois Brick* Court also believed that if indirect purchasers were allowed to bring price-fixing actions, the uncertainties and difficulties in analyzing price and out-put decisions, as well as the complexity of multiparty litigation involving many distribution levels and including large classes of ultimate consumers remote from the defendant, would undermine the efficient enforcement of the antitrust laws. *Id.* at 731–32, 737–38, 97 S.Ct. 2061.

¶ 23 Although the language of the Clayton Act interpreted by the Supreme Court in *Illinois Brick* is similar to that of A.R.S. § 44–1408(B), the holding of that case does not preempt state antitrust laws. In *California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), the states of Alabama, Arizona, California, and Minnesota brought class actions in federal courts alleging a nationwide conspiracy by various cement producers to fix the prices of cement. In addition to bringing federal claims, the plaintiffs alleged violations of their respective state antitrust laws under which indirect purchasers arguably were allowed to recover for all overcharges passed on to them by direct purchasers.[7] *Id.* at 97–98, 109 S.Ct. 1661.

---

5. Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

6. Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), provides in part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

7. The *ARC America* Court stated that the statutes of Alabama, California, and Minnesota expressly allowed indirect purchasers to sue. 490 U.S. at 98 n. 3, 109 S.Ct. 1661. The Court further noted

The lower courts held that the state indirect purchaser claims did not satisfy any exception to *Illinois Brick* and were therefore barred. *Id.* at 99, 109 S.Ct. 1661.

¶ 24 The Supreme Court reversed. It found that "[g]iven the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States." *Id.* at 101, 109 S.Ct. 1661 (footnote omitted). The Court concluded that Congress had not preempted the field of antitrust law but instead "intended the federal antitrust laws to supplement, not displace, state antitrust remedies." *Id.* at 102, 109 S.Ct. 1661.

¶ 25 In the Court's view, it was inappropriate to consider *Illinois Brick* and *Hanover Shoe* "as defining what federal law allows States to do under their own antitrust law." *Id.* at 103, 109 S.Ct. 1661. Rather, as the Court stated, "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *Id.*

¶ 26 Accordingly, *Illinois Brick* cannot bar indirect purchaser recovery under Arizona antitrust law where Arizona has not adopted that holding. Nevertheless, appellees argue that the holding of *Illinois Brick* ought to be followed in Arizona. They rely upon A.R.S. § 44–1412 (1994), which provides as follows:

> This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among those states that enact it. It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes.[8]

¶ 27 Appellees assert that, in light of this statute, Arizona courts should follow *Illinois Brick* because the Court there construed a

federal statute substantially similar to A.R.S. § 44–1408(B). Appellant disagrees, arguing that the language of § 44–1412 is permissive, not mandatory. It points out that in *Deer Valley Unified School District v. Superior Court of Maricopa County*, 157 Ariz. 537, 541, 760 P.2d 537, 541 (1988), the Arizona Supreme Court declined to follow a United States Supreme Court case interpreting language identical to a provision of the Arizona Constitution. In doing so, the Arizona court noted that while its view created some divergence between state and federal interpretations of substantially identical provisions, "the concept of federalism assumes the power, and duty, of independence in interpreting our own organic law." *Id.* (quoting *Pool v. Superior Court*, 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984)).

¶ 28 We acknowledge that Arizona appellate courts have typically followed federal case law in antitrust matters. *See, e.g., All Am. Sch. Supply Co. v. Slavens*, 128 Ariz. 261, 262, 625 P.2d 324, 325 (1981) (interpretation of federal antitrust statutes persuasive in interpreting A.R.S. § 44–1402); *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 57, 985 P.2d 535, 542 (App.1998) (analyzing requirements necessary to prove violation of A.R.S. § 44–1403 under federal case law interpreting section 2 of Sherman Act); *Wedgewood Inv. Corp. v. Int'l Harvester Co.*, 126 Ariz. 157, 160, 613 P.2d 620, 623 (App. 1979) (Arizona legislature clearly intended to strive for uniformity between federal and state antitrust laws).

¶ 29 Notwithstanding, we find it significant that our legislature provided in § 44–1412 that Arizona courts "may" use federal court interpretations as a guide in construing our own antitrust laws. The legislature's use of the word "may" suggests that the statute is permissive, not mandatory. *See, e.g., Outdoor Sys., Inc. v. City of Mesa*, 169 Ariz. 301,

---

that while the Arizona statute generally followed the language of the Clayton Act, "it might be interpreted as a matter of state law as authorizing indirect purchasers to recover." *Id.* The Court, however, did not have to interpret the Arizona statute to reach its holding and therefore expressed no opinion on this question of Arizona law. *Id.*

8. The second sentence of A.R.S. § 44–1412 does not appear in the Uniform State Antitrust Act. It was added by our legislature when adopting the uniform act. Unif. Antitrust Act § 12, 7C U.L.A. 369, Action in Adopting Jurisdictions (Master ed.2000).

307, 819 P.2d 44, 50 (1991); *Walter v. Wilkinson*, 198 Ariz. 431, 432, ¶ 7, 10 P.3d 1218, 1219 (App.2000). We also note that the legislature directed that federal cases may be used as a "guide" rather than adopting an imperative requiring that Arizona follow such interpretations.[9] Therefore, we do not find that A.R.S. § 44–1412 *requires* Arizona courts to interpret Arizona antitrust law in the same way that federal courts have interpreted federal antitrust law.

¶ 30 Admittedly, § 44–1412 could be viewed as encouraging Arizona courts to interpret § 44–1408 in line with federal authorities. But *Illinois Brick* was decided about three years after the current version of § 44–1408 was adopted. When § 44–1408 was passed, the controlling federal case law in the Ninth Circuit held that indirect purchasers had standing to bring an action to recover overcharges that resulted from an alleged conspiracy to fix prices. *In re W. Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir.1973).

¶ 31 In *Western Liquid Asphalt Cases*, the court concluded that the policy behind federal antitrust statutes, which was "to end anticompetitive acts in the most comprehensive way," favored permitting indirect purchasers to demonstrate injury resulting from any passed-on overcharge. *Id.* at 199. The court noted that the direct purchasers had not challenged the alleged price-fixing violations, presumably because they had passed the higher prices on to their customers. Also, the direct purchasers depended on the alleged violators for their supply of the product, and a measure of control and interdependence existed between the suppliers and those direct purchasers. *Id.* at 198. Therefore, the "presence of intermediaries" did not bar recovery for indirect consumers. *Id.* at 199.

¶ 32 Thus, in 1974, when the Arizona legislature adopted § 44–1408(B), it most likely knew of the *Western Liquid Asphalt Cases* holding, and believed that in Arizona, indirect purchasers would be allowed to bring antitrust actions. We, of course, presume that the legislature was aware of existing law when it passed the legislation.[10] *See Daou v. Harris*, 139 Ariz. 353, 357, 678 P.2d 934, 938 (1984). Consequently, because the legislature did not specifically limit standing to direct purchasers in its 1974 antitrust legislation, we conclude that it intended the term "a person" in § 44–1408(B) to include indirect purchasers.

¶ 33 Appellees nevertheless argue that this court has already addressed and rejected appellant's arguments by adopting the holding of *Hanover Shoe* and disallowing a pass-on defense in *Northern Arizona Gas Service, Inc. v. Petrolane Transport, Inc.*, 145 Ariz. 467, 702 P.2d 696 (App.1984), a breach of contract case. Appellees point out that the *Northern Arizona Gas Service* court concluded that, despite the contractual nature of the action, "the policy reason for disallowing the pass-through defense in anti-trust cases applies here with equal force." *Id.* at 476, 702 P.2d at 705.

---

9. Compare, for example, the language of A.R.S. § 44–1412, the Arizona "guidance" statute, with some of the more strongly worded provisions of other states: 740 Ill. Comp. Stat. Ann. 10/11 (West 1993) ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); Mich. Stat. Ann. § 28.70(14)(2) (Michie 1990) ("[I]n construing all sections of this Act, the courts shall give due deference to interpretations given by federal courts as a guide ...."); Nev.Rev.Stat. Ann. § 598A.050 (Michie Supp.1999) ("[T]he provisions of this chapter shall be construed in harmony with prevailing judicial interpretations given by federal courts to comparable antitrust statutes."); Wash. Rev.Code § 19.86.920 (1989) ("It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters ....").

10. Although at least one other federal circuit court held in the early 1970s that an indirect purchaser could not bring a price-fixing action, *see Mangano v. Am. Radiator & Standard Sanitary Corp.*, 438 F.2d 1187, 1188 (3.d Cir.1971), we presume that the Arizona legislature would have considered the holding in *Western Liquid Asphalt Cases* to be the guide for Arizona law both because Arizona is located in the Ninth Circuit and because the State of Arizona as well as several Arizona cities were involved in that litigation.

¶ 34 In *Northern Arizona Gas Service*, the trial court granted summary judgment for the plaintiff on its breach of contract claim, but the defendant argued that the plaintiff passed any overcharge on to its customers and thus suffered no damage. In discussing the "pass-through" defense, the court first noted that the defense had only been applied in the antitrust context and therefore determined that the defendant's argument was inapposite because the controversy centered on a breach of contract, not a violation of the regulatory scheme. *Id.* at 475, 702 P.2d at 704.

¶ 35 Notwithstanding, the *Northern Arizona Gas Service* court went on to state that, even if the defendant were properly relying on antitrust cases, its circumstances did not fall within the limited exception that allowed the pass-through defense. *Id.* The court agreed with the reasoning of *Hanover Shoe* that the complexity of proving the amount of overcharges passed on to consumers and separating them from the damage to the direct purchaser operated in favor of rejecting the pass-through defense. *Id.* Finally, the court noted that if the defendant were allowed to assert the pass-through defense, it would be able to retain a portion of its overcharges because the plaintiff's customers, who absorbed at least some of the damages, were not in privity with the defendant and thus could not sue it on the contract. *Id.* at 476, 702 P.2d at 705.

¶ 36 We conclude, however, that *Northern Arizona Gas Service* is not dispositive here because the pass-through defense is not at issue. Moreover, the concern of the *Northern Arizona Gas Service* court that a wrongdoing defendant not escape liability for damages is resolved if indirect purchasers, who need not be in privity with the defendants in antitrust cases, are allowed to bring actions against price-fixers. In any event, because we are addressing an antitrust case rather than a breach of contract case where different policy concerns apply, we are not persuaded that *Northern Arizona Gas Service* requires us to adhere to the holding of *Illinois Brick*.

¶ 37 Appellees next point out that most other states that allow indirect purchaser actions do so under statutes that specifically address the issue. They note that of the nineteen jurisdictions that recognize such actions, seventeen have statutory provisions to that effect.[11] Also, five appellate courts that have addressed the issue, including two federal courts interpreting state law, have decided to follow *Illinois Brick*. *See Free v. Abbott Labs., Inc.*, 176 F.3d 298, 301 (5th Cir.1999), *aff'd*, 529 U.S. 333, 120 S.Ct. 1578, 146 L.Ed.2d 306 (2000) (predicting Louisiana would follow *Illinois Brick*); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 (9th Cir.1999), *cert. denied*, 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000) (holding that indirect purchasers could not sue under Oregon antitrust law where parties treated state and federal antitrust claims as one and the same for purposes of standing analysis); *Duvall v. Silvers, Asher, Sher & McLaren*, 998 S.W.2d 821 (Mo.Ct.App.1999); *Abbott Labs., Inc. v. Segura*, 907 S.W.2d 503 (Tex.1995); *Blewett v. Abbott Labs., Inc.*, 86 Wash.App. 782, 938 P.2d 842 (1997). In *Commonwealth v. Massachusetts CRINC*, 392 Mass. 79, 466 N.E.2d 792, 801 n. 14 (1984), the court indicated in dicta that most likely, under *Illinois Brick*, the state's antitrust act did not allow indirect purchaser actions.

¶ 38 We, however, do not interpret the Arizona legislature's failure to explicitly authorize indirect purchaser claims as indicating its agreement with *Illinois Brick*. Silence on an issue is not an expression of legislative intent. *Southwestern Paint &*

---

11. A typical such statute is found in California, which provides that "[t]his action may be brought by any person who is injured in his or her business or property . . . regardless of whether such injured person dealt directly or indirectly with the defendant." Cal. Bus. & Prof.Code § 16750(a) (West 1997). Similar statutes have been adopted in Alabama, the District of Columbia, Hawaii, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Dakota, South Dakota, Vermont, and Wisconsin. Four other states permit indirect purchaser actions if filed by a governmental agency. *See* Colo.Rev.Stat. Ann. § 6–4–111(3)(a) (West 1992); Idaho Code § 48–108(2) (Michie Supp.2001); Md.Code Ann., Com. Law I § 11–209(b)(2)(ii) (Supp.1998); R.I. Gen. Laws § 6–36–12(a), (g) (2001).

*Varnish Co. v. Ariz. Dep't of Envtl. Quality,* 194 Ariz. 22, 26, ¶ 21, 976 P.2d 872, 876 (1999). Furthermore, the theory of legislative acquiescence "is limited to instances in which the legislature has considered and declined to reject the relevant judicial interpretation." *Id.* at 25, ¶ 21, 976 P.2d at 875. Here, not only do we have no record that the Arizona legislature ever considered making *Illinois Brick* the law in Arizona, but its action in 1974 was presumably based on the holding in the *Western Liquid Asphalt Cases.* Therefore, we do not consider the legislature's post–1977 silence on the issue of indirect purchaser standing as an indication that it acquiesces in the holding of *Illinois Brick.*

¶ 39 We further note that a state court in North Carolina has allowed an indirect purchaser remedy where that state's statute did not address the question.[12] In *Hyde v. Abbott Laboratories, Inc.,* 123 N.C.App. 572, 473 S.E.2d 680, 684 (1996), while the court noted that "[f]ederal case law interpretations of the federal antitrust laws are persuasive authority in construing our own antitrust statutes," it found that because in 1969, when the North Carolina antitrust statute was adopted, most federal circuit courts construed section 4 of the Clayton Act to allow suits by indirect purchasers, its general assembly could not have intended to adopt a judicial construction of its law that did not exist until *Illinois Brick* was decided in 1977. *Id.* at 684–85. Accordingly, the *Hyde* court concluded that in light of *ARC America* and the purposes behind its state's antitrust laws, the *Illinois Brick* limitation did not apply in North Carolina. *Id.* at 686–87.

¶ 40 But appellees go on to suggest that if we allow indirect purchaser antitrust actions under state law, we will be the only state having a federal guidance statute to decline to follow *Illinois Brick.* As we noted above, however, our federal guidance statute is permissive, not mandatory. Furthermore, the laws of other jurisdictions, while sometimes instructive, are not binding upon us. The fact that Arizona may not follow the course taken by other states in this issue does not dissuade us from interpreting § 44–1408(B) in a manner that we believe is consistent with Arizona's constitution, the legislative intent, and the purposes and policies behind our antitrust statutes.

¶ 41 Finally, even though we have determined that *Illinois Brick* does not bind this court, we still consider whether we should adopt the policy rationale of that case. We conclude that we ought not do so.

¶ 42 Amicus curiae, the State of Arizona, notes that the rule in *Illinois Brick* has been denounced as bad public policy by a number of legal commentators.[13] For example, a leading authority on antitrust law states:

> The obvious difficulty with denying damages for consumers buying from an intermediary is that they are injured, often more than the intermediary, who may also be injured but for whom the entire overcharge is a windfall. The indirect purchaser rule awards greatly overcompensate intermediaries and greatly undercompensate consumers in the name of efficiency in the administration of the antitrust laws.

Areeda, Blair & Hovencamp, *supra* note 13, at 378. A second commentator similarly stated:

> Although *Illinois Brick* was intended in part to accommodate the earlier rule first advanced in *Hanover Shoe,* that the defendant could not defend against an action by

12. In addition, the court in *Mack v. Bristol–Myers Squibb Co.,* 673 So.2d 100, 110 (Fla.Dist.Ct.App. 1996), while acknowledging that the plaintiff did not challenge the trial court's conclusion that under *Illinois Brick* indirect purchasers could not bring a Florida antitrust claim, held that an indirect purchaser did have standing to maintain an action under the Florida Deceptive and Unfair Trade Practices Act.

13. *See* Phillip E. Areeda, Roger D. Blair & Herbert Hovencamp, *Antitrust Law,* ¶ 346 at 378 (2000); Joseph P. Bauer, *The Stealth Assault on Antitrust Enforcement: Raising the Barriers for Antitrust Injury and Standing,* 62 U. Pitt. L.Rev. 437 (2001); Roger D. Blair & Jeffrey L. Harrison, *Reexamining the Role of Illinois Brick in Modern Antitrust Standing Analysis,* 68 Geo. Wash. L.Rev. 1 (1999); Kevin J. O'Connor, *Is the Illinois Brick Wall Crumbling?,* 15 Antitrust 34, 34–35, 37–38 (2001); Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis,* 128 U. Pa. L.Rev. 269, 270–73, 338–54 (1979).

a direct purchaser by asserting that the customer had in turn passed on the higher costs to its own customers, the net effect of these two decisions has been to bar actions by the parties who not only are most frequently actually injured by the antitrust violations, but also by those parties who often are most likely to wish to assert a claim.

Bauer, *supra* note 13, at 443.

¶ 43 Another of the concerns of the *Illinois Brick* Court was that "requiring direct and indirect purchasers to apportion the recovery under a single statute— § 4 of the Clayton Act—would result in no one plaintiff having a sufficient incentive to sue under the statute." *ARC America*, 490 U.S. at 104, 109 S.Ct. 1661. The *ARC America* Court stated, however, that "[s]tate indirect purchaser statutes pose no similar risk to the enforcement of the federal law." *Id.* The *Hyde* court explained that this is true "because a defendant guilty of an antitrust violation would face paying damages to indirect purchasers under state antitrust laws as well as paying any damages awarded to direct purchasers under federal antitrust laws" such that "both direct and indirect purchasers would have a sufficient incentive to sue for violations." *Hyde*, 473 S.E.2d at 687.

¶ 44 *Illinois Brick* also raised the spectre of multiple liability for defendants if both a direct and an indirect purchaser recovered the full amount of the overcharge. 431 U.S. at 730, 97 S.Ct. 2061. The *Hyde* court noted, however, that there were few, if any, "reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation." 473 S.E.2d at 687 (citing Thomas Greene, *Should Congress Preempt State Indirect Purchaser Laws? Counterpoint: State Indirect Purchaser Remedies Should be Preserved*, 5 Antitrust 25, 26–27 (1990)). Clearly, trial courts are capable of ensuring that antitrust defendants do not pay more than the total amount of damages to which all the parties are entitled. *See W. Liquid Asphalt Cases*, 487 F.2d at 201 ("[W]e therefore see no problem of double recovery .... [I]f this difficulty should arise ... the district court will be able to fashion relief accordingly ....

The day is long past when courts ... will deny relief to a deserving plaintiff merely because of procedural difficulties or problems of apportioning damages.").

¶ 45 Last, the *Illinois Brick* Court was concerned that allowing actions by indirect purchasers would lead to highly complex litigation. 431 U.S. at 732, 97 S.Ct. 2061. While we do not doubt that this concern is valid, we note that highly complex litigation is something that is not foreign to trial courts. Indeed, as Justice Brennan pointed out in his dissent in *Illinois Brick*, almost all antitrust cases are characterized by "long and complicated proceedings involving massive evidence and complicated theories." *Id.* at 758, 97 S.Ct. 2061. Allowing indirect purchaser actions should not unreasonably complicate antitrust litigation. In addition, it is likely that the complexity in cases brought under a state antitrust law and affecting consumers only in that state would be less complex than federal cases that involve nationwide classes.

¶ 46 For all of the reasons discussed above, we conclude that interpreting A.R.S. § 44–1408(B) to allow indirect purchaser actions best serves the goals and policies of Arizona's antitrust constitutional provision and statutes.

### CONCLUSION

¶ 47 We hold that indirect purchasers may bring antitrust actions under A.R.S. § 44–1408(B). Accordingly, we reverse the judgment of the trial court in favor of the appellees and remand for further proceedings consistent with this opinion.

CONCURRING: JAMES B. SULT, Presiding Judge, and CECIL B. PATTERSON, JR., Judge.