270 P.3d 839

Anthony FOGLIANO; Gary Hinchman; Richard Lilly; Jacqueline Duhame; Catherine Nichols; Mountain Park Health Center; Jorge Heredia; Tracy Dykes; Thomas Casteel; and Belen Cartagena, Petitioners,

v.

The Honorable Mark H. BRAIN, Judge of the Superior Court of the State of Arizona, in and for the COUNTY OF MARICOPA, Respondent Judge,

State of Arizona; and Tom Betlach, in his capacity as Director of the Arizona Health Care Cost Containment System ("AHCCCS"), Real Parties in Interest.

No. 1 CA–SA 11–0204.

Court of Appeals of Arizona, Division 1, Department C.

Dec. 6, 2011.

As Amended April 17, 2012.

Arizona Center for Law in the Public Interest By Timothy M. Hogan, Anne C. Ronan, Joy Herr–Cardillo and William E. Morris Institute for Justice By Ellen S. Katz, Tami L. Johnson and Arizona Center for Disability Law By Jennifer Alewelt and Sarah E. Kader, Phoenix, Co–Counsel for Petitioners.

Thomas C. Horne, Arizona Attorney General By Kevin D. Ray, Kathleen P. Sweeney and Jinju Park Hurtado, Phoenix, Attorneys for Real Party in Interest State of Arizona.

Ballard Spahr LLP By Joseph A. Kanefield, Jaclyn D. Foutz and Johnston Law Offices, P.L.C. By Logan T. Johnston, III and Catherine D. Plumb, Phoenix, Co–Counsel for Real Party in Interest Tom Betlach.

Office of the President, Arizona State Senate By Gregrey G. Jernigan and Office of the Speaker, Arizona House of Representatives By Peter A. Gentala, Phoenix, Attorneys for Statutory Participants.

LaSota & Peters, PLC By Donald M. Peters and Kristin M. Mackin, Phoenix, Attorneys for Amicus Curiae Cave Creek Unified School District, et al.

Gammage & Burnham P.L.C. By John R. Dacey, Phoenix, Attorneys for Amicus Curiae Arizona Council of Human Service Providers, Inc., and Maricopa County Consumers Advocates and Providers, Inc.

## OPINION

NORRIS, Judge.

¶ 1 The fundamental issue in this special action is whether Proposition 204, a voter-enacted initiative expanding the number of Arizonans "eligible" to receive Medicaid benefits, requires the Legislature to appropriate supplemental funding to serve this expanded population. Although we agree with Petitioners Proposition 204 directs the Legislature to provide supplemental funding from "any other available sources," whether the Legislature has complied with this directive presents a political question not appropriate for judicial resolution. This is because determining whether the Legislature has, as it has stated, or has not, as Petitioners argue, provided supplemental funding from "any other available sources" would require the Judiciary to set priorities and make funding decisions entrusted to the other branches of government. Thus, although we disagree with much of the analysis applied by the superior court in rejecting Petitioners' claims, we nevertheless affirm its denial of their request for relief.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The voters passed Proposition 204 in the 2000 General Election. This initiative measure amended the statutes dealing with Arizona's Medicaid agency, the Arizona Health Care Cost Containment System ("AHCCCS"), to substantially expand the number of people "eligible" to receive health care subsidized by state, county, and federal funds.[1] This expansion was essentially accomplished by raising the income cutoff for "any person" applying for AHCCCS benefits from 34% to 100% of the federal poverty guidelines.[2] According to the record before us, currently, "[m]ore than one in four individuals receiving AHCCCS benefits is covered because of Proposition 204." Proposition 204 specified funding for this expansion would "come from the Arizona tobacco litigation settlement fund," (the "TLS fund") which was to consist of "all monies that [Arizona] receives pursuant to the tobacco litigation master settlement agreement en-

---

1. Proposition 204 was codified in Arizona Revised Statutes sections 36–2901.01 and 36–2901.02. The relevant language of Proposition 204 is codified as follows:

   A. For the purposes of § 36–2901, "eligible person" includes any person who has an income level that, at a minimum, is between zero and one hundred per cent of the federal poverty guidelines.... Neither the executive department nor the legislature may establish a cap on the number of eligible persons who may enroll in the system.
   B. To ensure that sufficient monies are available to provide benefits to all persons who are eligible pursuant to this section, fund-

ing shall come from the Arizona tobacco litigation settlement fund established by § 36–2901.02 and shall be supplemented, as necessary, by any other available sources including legislative appropriations and federal monies.

Ariz.Rev.Stat. § 36–2901.01 (2000).

2. Under the 2011 federal poverty guidelines, a single adult living in Arizona with an annual income of $10,890 would be at 100% of the federal poverty guidelines, and a similarly situated person with an income of roughly $3,590 would be at 33%. Notice, Annual Update of the Health and Human Services Poverty Guidelines, 76 Fed. Reg. 3637, 3637–38 (Jan. 20, 2011).

tered into on November 23, 1998 and interest earned on these monies." *See* Ariz. R. Stat. ("A.R.S.") § 36–2901.02(A) (2000). In addition, Proposition 204 stated "[t]o ensure that sufficient monies are available to provide benefits to all persons who are eligible," the TLS fund "shall be supplemented, as necessary, by any other available sources including legislative appropriations and federal monies" (the "supplemental funding provision"). *See* A.R.S. § 36–2901.01(B) (2000). Proposition 204 further barred the State from capping enrollment of eligible individuals ("cap prohibition"): "Neither the executive department nor the legislature may establish a cap on the number of eligible persons who may enroll in the system." *See* A.R.S. § 36–2901.01(A). This provision may have been a response to the fate of a similar initiative passed in 1996—Proposition 203—which, Petitioners assert, was frustrated by "[s]tate officials ... [who] insisted on capping the number of eligible individuals in the program."

¶ 3 The TLS fund has historically failed to meet the funding requirements for the Proposition 204 expanded population. Thus, in accordance with the supplemental funding provision, the Legislature has appropriated supplemental funding from the general fund to provide AHCCCS services for Proposition 204 "eligible" individuals. Then, in early 2011, faced with a deepening budget crisis, Governor Jan Brewer and the Legislature initiated a series of measures to reduce the "explosive growth" of AHCCCS spending. *See* Statement by Governor Jan Brewer, Office of the Governor (Jan. 21, 2011), http://www.azahcccs.gov/reporting/Downloads/Budget Proposals/FY2012/1–21–11Statementby GovernorJanBrewerMedicaidWaiver.pdf (last visited Nov. 30, 2011).

¶ 4 First, in January 2011, the Legislature passed and Governor Brewer signed Senate Bill 1001. That legislation instructed AHCCCS to "apply to the secretary of the United States department of health and human services for a waiver from the maintenance of eligibility requirements."[3] S.B. 1001, 50th Leg., 1st Spec. Sess. § 1(A) (Ariz. 2011); 2011 Ariz. Sess. Laws, ch. 1, § 1 (1st Spec. Sess.). Upon approval of the waiver request, AHCCCS was further instructed to "adopt rules ... for determining eligibility necessary to implement a program within the monies available from the [TLS fund] ... and any other legislative appropriation and federal monies made available for the support of the program." *Id.* § 1(B). If these monies were "insufficient to fund all existing programs," AHCCCS was authorized to "suspend any programs or eligibility for any persons or categories of persons" who would otherwise be eligible for AHCCCS benefits. *Id.*

¶ 5 As authorized by Senate Bill 1001, Governor Brewer applied to federal Medicaid authorities for a "maintenance of efforts" waiver, although, as it turned out, the State was not required to seek a waiver. As Secretary Kathleen Sebelius of the United States Department of Health and Human Services ("HHS") informed Governor Brewer, the State could simply "choose to terminate its current demonstration[4] on September 30, 2011 and either not pursue a new demonstration or pursue a different demonstration." Letter from Kathleen Sebelius, Sec'y. of HHS, to Governor Brewer at 3 (Feb. 15, 2011), http://www.azahcccs.gov/shared/Downloads/News/SebeliusLetter_JaniceBrewer.pdf (last visited Dec. 1, 2011). Accordingly, on March 31, 2011, Governor Brewer sent a letter to HHS proposing a new demonstration "retain[ing] coverage for

---

3. Because federal laws, known as "maintenance of effort requirements," generally prevent states from lowering their eligibility levels for Medicaid assistance, the Governor and Legislature believed the State had to seek a "waiver" from these requirements from the United States Department of Health and Human Services.

4. "Demonstrations" are state projects "likely to assist in promoting the objectives of the Medicaid statute.... These projects are intended to demonstrate and evaluate a policy or approach [that]

has not been demonstrated on a widespread basis. Some states expand eligibility to individuals not otherwise eligible under the Medicaid program, provide services that are not typically covered, or use innovative service delivery systems." *See* Research & Demonstration Projects—Section 1115, Centers for Medicare & Medicaid Services, https://www.cms.gov/MedicaidStWaivProgDemoPGI/03_Research&DemonstrationProjects–Section1115.asp (last visited Nov. 30, 2011).

Arizonans currently on Medicaid" but "freez[ing] enrollment for childless adults beginning July 1, 2011." Letter from Governor Brewer to Kathleen Sebelius, Sec'y. of HHS at 2 (March 31, 2011), http://www.azahcccs.gov/reporting/Downloads/1115waiver/Waiver Packet_3_31_11.pdf (last visited Dec. 1, 2011).

¶ 6 Then, on April 6, 2011, the Legislature passed and Governor Brewer signed Senate Bill 1612, a general appropriations bill that reduced AHCCCS funding by nearly $1.6 billion. Senate Bill 1612 specified "[t]he amounts [appropriated for Proposition 204 services] include[ ] all available sources of funding consistent with" the supplemental funding provision. S.B. 1612, 50th Leg., 1st Reg. Sess. § 9 (Ariz. 2011); 2011 Ariz. Sess. Laws, ch. 24, § 9 (1st Reg. Sess.). That same day, Governor Brewer also signed Senate Bill 1619, which, "[n]otwithstanding any other law," authorized AHCCCS to "adopt rules necessary to implement a program within available appropriations" and establish "rules ... for determining eligibility necessary to implement a program within the available appropriation." S.B. 1619, 50th Leg., 1st Reg. Sess. § 34(A), (A)(2) (Ariz. 2011); 2011 Ariz. Sess. Laws, ch. 31, § 34(A), (A)(2) (1st Reg. Sess.).

¶ 7 On July 1, 2011, HHS granted permission to "phase out" the existing demonstration. Consistent with Senate Bill 1619 and despite the cap prohibition, on July 8, 2011, AHCCCS implemented a new rule freezing new childless adult enrollment, to "comply with the legislative requirement that [AHCCCS] adopt rules regarding eligibility necessary to implement a program within available appropriations." Ariz. Admin. Code R9–22–1443, Preamble, ¶ 6 (eff. July 8,

2011). As of the date of this opinion, the current rule states AHCCCS shall not "approve eligibility with an effective date on or after July 8, 2011 for the [childless adult] population." R9–22–1443(A) (the "enrollment freeze"). This enrollment freeze has affected thousands of Arizonans who otherwise would have been eligible to receive health care benefits through AHCCCS under Proposition 204.

¶ 8 In June, before the effective date of the new rule, Petitioners sued the State and AHCCCS in the superior court. Requesting declaratory and injunctive relief, they asserted the Legislature's failure to provide supplemental funding from "any other available sources" and the resulting enrollment freeze violated Proposition 204 and the Voter Protection Act, a set of amendments to the Arizona Constitution approved by voters in 1998 that prohibit the Legislature from repealing voter-enacted initiative or referendum measures and severely restrict the Legislature's power to amend such measures. Ariz. Const. art. 4, pt. 1, § 1(6)(B)-(C).[5]

¶ 9 The parties stipulated to the factual background discussed above and presented legal arguments during a hearing in which they asked the superior court to "treat ... [their arguments] as a trial on the merits, and have the Court issue a final judgment on all of the plaintiffs' claims following the hearing." After this hearing, the superior court ruled "[t]he Legislature does not have an enforceable duty to fund Proposition 204, and the scope (and limits) of [AHCCCS Director] Betlach's duty is to continue to ensure that his agency is providing healthcare to the extent possible under Proposition 204 within the limits of the funding provided to him."

---

5. The Legislature may not amend voter-enacted measures unless "the amending legislation furthers the purposes of such measure and [the amendment is approved by] at least three-fourths of the members of each house of the legislature." *Id.* § 1(6)(C). The Voter Protection Act also prohibits the Legislature from appropriating or diverting funds allocated by an initiative measure unless it furthers the purpose of the measure. *Id.* § 1(6)(D). As explained by our supreme court,

The Voter Protection Act altered the balance of power between the electorate and the legislature, which share lawmaking power under Ari-

zona's system of government. Before the measure's passage, legislators could "by a majority vote ... amend or repeal any ballot measure ... approved by the voters, [unless] that ballot measure was approved by a majority of the people ... registered to vote in this state, rather than by a majority of people who voted on the ballot measure." Backers of the measure were concerned that the legislature was abusing its power to amend and repeal voter-endorsed measures.

*Arizona Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 469, ¶ 7, 212 P.3d 805, 807 (2009) (internal citations omitted).

The superior court further ruled the Voter Protection Act was not implicated by the State's actions because "[a]lthough the Voter Protection Act *prohibits* the Legislature from doing numerous things, it does not *require* the Legislature to do anything—specifically, it does not require the Legislature to fund programs." The superior court accordingly denied Petitioners all relief and entered judgment for the State and Betlach.

¶ 10 Petitioners then filed a Petition for Special Action with this court, seeking our expedited review of the superior court's judgment due to "the urgency of this matter, and the devastating injury to the Petitioners and thousands of other individuals." Betlach and the Arizona Attorney General's office responded to the Petition, and the President of the Senate and the Speaker of the House of Representatives filed a brief, pursuant to A.R.S. § 12–1841(D), in opposition to the Petition (unless separately referenced, these parties collectively referred to as "Respondents"). Two groups of organizations filed amicus curiae briefs supporting the arguments of Petitioners.[6] Because the Petition raises purely legal questions of statewide importance, we accepted special action jurisdiction. *See State ex rel. Romley v. Martin,* 203 Ariz. 46, 47, ¶ 4, 49 P.3d 1142, 1143 (App.2002).

### DISCUSSION

¶ 11 Petitioners essentially argue—and Respondents deny—Proposition 204, construed as a whole, requires the Legislature to provide funding from "any other available sources" so every Proposition 204 "eligible" person may receive AHCCCS ben-

efits. Petitioners further argue the enrollment freeze resulting from the Legislature's failure to provide such funding violates the cap prohibition as well as the Voter Protection Act.[7] Because these arguments raise issues of law and statutory construction our review is de novo. *See State ex rel. Romley v. Hauser,* 209 Ariz. 539, 540, ¶ 4, 105 P.3d 1158, 1159 (2005).

¶ 12 After reviewing the conflicting arguments of the Petitioners and Respondents, we hold: first, the supplemental funding provision is not an appropriation; second, contrary to the superior court's conclusion, the supplemental funding provision requires the Legislature to supplement the TLS fund with "any other available sources" of funding; and third, whether the Legislature has done so is a nonjusticiable political question. Accordingly, we affirm the superior court's decision denying Petitioners all relief.

### I. The Supplemental Funding Provision is Not an Appropriation

¶ 13 Petitioners conceded in the superior court and acknowledge in this special action the supplemental funding provision is not, in itself, an appropriation. Consequently, Petitioners have not argued the Legislature diverted any funds allocated by the voters for AHCCCS benefits in violation of the Voter Protection Act. *See supra* note 5. Although we are not bound by the parties' interpretation of the law, *see Mora v. Phoenix Indem. Ins. Co.,* 196 Ariz. 315, 318 n. 3, ¶ 14, 996 P.2d 116, 119 n. 3 (App.1999), we nevertheless agree with Petitioners the supplemental funding provision is not an appropriation.

---

6. One amicus curiae brief was filed on behalf of Cave Creek Unified School District, Casa Grande Elementary School District, Crane Elementary School District, Palominas Elementary School District, Yuma Union High School District, Arizona Education Association, Arizona School Boards Association, Scott Holcomb, Frank Hunter, and Nancy Putman; a second amicus curiae brief was filed on behalf of Arizona Council of Human Service Providers, Inc., and Maricopa County Consumers Advocate and Providers, Inc. ("Provider Amici").

7. Petitioners also argue the Legislature's funding decisions violate Arizona case law prohibiting

the use of the appropriations process for legislative purposes. *See State v. Angle,* 54 Ariz. 13, 21, 91 P.2d 705, 708 (1939). Here, as discussed at *supra* ¶¶ 4–6, the provisions authorizing the enrollment freeze were contained in Senate Bills 1001 and 1619; neither of these bills were appropriation bills. In addition, "there can be little doubt that unless the legislature provides the necessary funds, a program cannot function, and for the legislature to fail to provide the funds is not a use of the appropriations function for legislative purposes." *Cochise Cnty. v. Dandoy,* 116 Ariz. 53, 56, 567 P.2d 1182, 1185 (1977).

¶ 14 An appropriation requires (1) legislative intent to (2) set aside a certain sum for a specified object and (3) an authorization for executive officers to spend that money. *See Rios v. Symington*, 172 Ariz. 3, 8, 833 P.2d 20, 25 (1992). Here, although the language of the supplemental funding provision demonstrates the proponents of Proposition 204 wanted the Legislature to allocate monies to provide AHCCCS benefits to all eligible individuals, the required language specifying a "certain sum" is noticeably absent. "[W]hen a legislative appropriation is directed to be paid out of the general fund, but not to comprise the whole of such fund, the appropriation must be specific as to a maximum amount and cannot be left indefinite and uncertain in this regard." *Crane v. Frohmiller*, 45 Ariz. 490, 497, 45 P.2d 955, 958 (1935). Although the supplemental funding provision certainly contemplates future legislative appropriations, "[a] promise by the government to pay money is not an appropriation. A duty on the part of the legislature to make an appropriation is not such. A promise to make an appropriation is not an appropriation." *Id.* at 498, 45 P.2d at 959.

¶ 15 Further, as explained by our supreme court,

No rule is better settled than that to constitute a valid appropriation payable out of the general fund the Act must fix a maximum limit as to the amount that can be drawn under it. If this was not the law there would be no limit to the amount of money that could be drawn thereunder and the public treasury would be wholly unpro-. tected against claims of an undetermined amount.

*Cockrill v. Jordan*, 72 Ariz. 318, 319, 235 P.2d 1009, 1010 (1951) (internal citations omitted). We therefore hold the supplemental funding provision is not an appropriation.[8]

## II. The Supplemental Funding Provision Directs the Legislature to Supplement the TLS Fund with Any Other Available Sources of Funding

¶ 16 Because the supplemental funding provision is not an appropriation, we must determine what it requires. Petitioners argue "[t]he fact that the obligation is not in the form of a self executing appropriation does not render it unenforceable." Thus, they argue Proposition 204, construed as a whole, directs the State "to provide health care benefits to all [eligible] individuals." We agree, and therefore disagree with the superior court that Proposition 204 "merely contemplates that the Legislature will pass legislation to fund the program."

¶ 17 In construing statutes adopted by initiative, "[o]ur primary objective ... is to give effect to the intent of the electorate." *State v. Gomez*, 212 Ariz. 55, 57, ¶ 11, 127 P.3d 873, 875 (2006). If the language of an initiative is clear and unambiguous and therefore "subject to only one reasonable meaning, we do so by applying the language without using other means of statutory construction." *Id.*

¶ 18 The language of the supplemental funding provision contains mandatory directives: "[t]o *ensure* that sufficient monies are available to provide benefits to *all persons* who are eligible ... funding ... *shall be* supplemented, *as necessary*, by any other available sources including legislative appropriations and federal monies." A.R.S. § 36–

---

8. If the proponents of Proposition 204 had included a self-executing, continuing appropriation in the supplemental funding provision, we would be required to give it legal effect. Although Respondents broadly argue "[n]othing ... authorizes the voters to restrict the plenary legislative authority that the Constitution has vested in the Legislature by requiring the Legislature to appropriate funds in accordance with directives in voter-enacted statutes," they recognize the Voter Protection Act, *see supra* note 5 and accompanying text, "altered the balance of power between the electorate and the legislature," *Arizona Early Childhood*, 221 Ariz. at 469, ¶ 7, 212 P.3d at 807, and accordingly concede voter-enacted appropriations may "impact the choices that the Legislature can make in exercising its legislative discretion." We agree the voters can certainly limit legislative discretion by making a continuing appropriation, and, indeed, specifically did so here, as Respondents acknowledge, by appropriating the TLS fund. *See* A.R.S. § 36-2901.02(E) ("Monies in the [TLS] fund: ... Are continuously appropriated."); *see also People's Advocate, Inc. v. Superior Court*, 181 Cal.App.3d 316, 329 n. 13, 226 Cal.Rptr. 640, 647 n. 13 (1986) ("as a practical fiscal matter, a statute [enacted through initiative] containing a continuing appropriation may limit the Legislature's *financial choices* in other appropriations measures.").

2901.01(B) (emphasis added); *see supra* note 1. Other language in Proposition 204 underscores the mandatory nature of the supplemental funding provision, such as the definition of eligibility, which "includes *any person* who has [the required] income level." A.R.S. § 36–2901.01(A) (emphasis added). Notwithstanding these mandatory directives, Respondents attribute great significance to the phrase "any other available sources," and, more specifically, argue the use of the word "available" in this context "left the Legislature the discretion to determine what portion of the general fund would be 'available' to supplement the [TLS fund]."

¶ 19 Because Proposition 204 does not define the word "available," we use its ordinary meaning unless "the context clearly indicates that a special meaning was intended." *Trustmark Ins. Co. v. Bank One, Arizona,* 202 Ariz. 535, 541, ¶ 27, 48 P.3d 485, 491 (App.2002). "Available" can mean either present and ready for use, or capable of being gotten, obtainable. *American Heritage Dictionary* 123 (4th ed. 2001); *see In re Pinal Cnty. Mental Health No. MH–201000029,* 225 Ariz. 500, 504 n. 4, ¶ 15, 240 P.3d 1262, 1266 n. 4 (App.2010) ("In the absence of a statutory definition, a dictionary may be consulted to determine the ordinary meaning of words used in a statute."). The first time the word is used—"to ensure that sufficient monies are *available*"—the context suggests it is in the "ready for use" sense. The second time the word is used—"by any other *available* sources"—the context suggests it is in the "obtainable" sense. Because determining whether something is "obtainable" necessarily requires the exercise of judgment, the word "available" does suggest a discretionary function within the supplemental funding provision.

¶ 20 Nevertheless, we believe the view urged by Respondents—that this single, possibly discretionary word transforms the supplemental funding provision into nothing more than a permissive guideline—disregards the compulsory nature of the provision and Proposition 204 as a whole, as evidenced by its plain language. When interpreting statutes, "[e]ach word, phrase, clause and sentence must be given meaning so that no

part will be void, inert, redundant or trivial." *Maricopa Cnty. v. Arizona Tax Court,* 162 Ariz. 64, 68, 781 P.2d 41, 45 (App.1989). Additionally, "we will consider the meaning naturally attaching to the statutory language and will adopt that meaning which best harmonizes with the context." *Id.* The construction suggested by Respondents conflicts with other provisions of Proposition 204, most obviously the provision that "[n]either the executive department nor the legislature may establish a cap on the number of eligible persons who may enroll in the system." *See* A.R.S. § 36–2901.01(A). A construction of Proposition 204 prohibiting the Legislature from establishing a cap on enrollment, but then giving the Legislature discretion to provide—or choose not to provide—the funding necessary to avoid such a cap would be internally contradictory.

¶ 21 By interpreting the word "available" in the overall context of Proposition 204, as evidenced by its plain language, we read the supplemental funding provision to mean what it says: if supplemental funding is needed, the Legislature shall provide it from "any other available sources." Whether the Legislature has done so, however, presents a nonjusticiable political question, as we discuss below.

### III. Whether the Legislature Has Appropriated Supplemental Funding From "Any Other Available Sources" is a Nonjusticiable Political Question

¶ 22 As discussed, in Senate Bill 1612, the Legislature stated it had appropriated "all available sources of funding" and in Senate Bill 1619, it authorized AHCCCS to adopt, by rule, the enrollment freeze. *See supra* ¶¶ 6–7. Petitioners argue, however, the Legislature has not actually appropriated all available sources of funding and the resulting enrollment freeze violates both Proposition 204 and the Voter Protection Act. Consistent with this argument, Provider Amici suggest the Legislature had options for "other available sources" of funding, such as a "bed tax" proposed by the Arizona Hospital and Healthcare Association and "a temporary, progressive income tax on high wage-earners." Petitioners and Provider Amici

therefore want us to decide whether the Legislature has, in fact, tapped "any other available sources" of supplemental funding. This controversy over the Legislature's funding decisions and the resulting enrollment freeze is not one we should decide; it involves a nonjusticiable political question.

¶ 23 A "controversy is nonjusticiable—*i.e.*, involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993) (internal citation omitted); *see also Forty–Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485, ¶ 7, 143 P.3d 1023, 1026 (2006) (same standard used in Arizona courts). The Arizona Constitution "expressly provides that the departments of our state government 'shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.'" *Kromko v. Arizona Bd. of Regents*, 216 Ariz. 190, 193, ¶ 12, 165 P.3d 168, 171 (2007) (quoting Ariz. Const. art. 3). Thus, because we recognize the importance of the separation of powers and "that some decisions are entrusted under the ... constitution to branches of government other than the judiciary.... Arizona courts refrain from addressing political questions." *Id.* at 192, ¶ 12, 165 P.3d at 170 (internal citations omitted).

¶ 24 Here, the people, acting in their legislative capacity, directed the Legislature to supplement the TLS fund with "any other available sources"; the Legislature, in turn, acting in *its* legislative capacity, has declared it has done so. The Arizona Constitution specifies "[n]o money shall be paid out of the state treasury, except in the manner provided by law." Ariz. Const. art. 9, § 5. This provision "has been construed to mean that no money can be paid out of the state treasury unless the legislature has made a valid appropriation for such purpose and funds are available for the payment of the specific claim." *Cockrill*, 72 Ariz. at 319, 235 P.2d at 1010. Thus, whether and how much money can be paid out of the state treasury is clearly committed by our Constitution to those acting in a legislative capacity. Here, because the people did not, with the exception of the TLS fund, make a self-executing appropriation, the determination of "any other available sources" is, under our Constitution, left to the Legislature, not the Judiciary. This conclusion, however, that "the Constitution assigns th[is] power ... to other branches of government simply begins the inquiry" into whether the Legislature's determination of what "other available sources" exist is justiciable. *Kromko*, 216 Ariz. at 193, ¶ 13, 165 P.3d at 171.

¶ 25 The "second critical prong of the political question test: whether there exist judicially discoverable and manageable standards," *id.* at ¶ 14, overlaps with and informs the first prong. "[T]he lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Id.* (quoting *Nixon*, 506 U.S. at 228–29, 113 S.Ct. at 735). There are no "judicially discoverable and manageable standards" we may draw on to ascertain whether the Legislature has supplemented the TLS fund with "any other available sources"; in these circumstances, we are ill-equipped to inquire into and second-guess the complexities of decision-making and priority-setting that go into managing the State's budget and the appropriations made pursuant to budgetary decisions. *See, e.g., Brewer v. Burns*, 222 Ariz. 234, 239, ¶ 21, 213 P.3d 671, 676 (2009) (internal citation omitted) (questions involving "whether the Legislature should include particular items in a budget or enact particular legislation ... clearly are political questions").

¶ 26 Petitioners argue "there is an objective standard in this case for the Court to determine compliance: the state must provide AHCCCS benefits to everybody with incomes at or below federal poverty level and the executive and legislative branches are prohibited from establishing any caps on the number of eligible persons." This argument avoids the precise nonjusticiable question before us. The standard Petitioners suggest measures whether the Legislature has provided funding for all individuals eligible for

benefits under Proposition 204. But, this standard provides us with no satisfactory criteria to measure whether the Legislature has appropriated "any other available sources" of supplemental funding as it says it has. In deciding what other available sources exist, the Legislature has had to make (and will have to make) subjective policy choices: should it allocate monies that would otherwise be used to fund our schools, prisons, parks, and highways as other available sources? Or, should it raise taxes to obtain other available sources? These are not issues a court should review; it is not our constitutional role to assess the soundness of the State's financial prioritizations.

¶ 27 Our supreme court was presented with a similar situation in *Kromko*, 216 Ariz. 190, 165 P.3d 168. There, the issue was whether tuition at Arizona's state universities was "as nearly free as possible," as required by Article II, Section 6 of our state constitution. *Id.* at 191, ¶ 1, 165 P.3d at 169. The court held this issue presented a nonjusticiable political question because setting university tuition was constitutionally entrusted to the other branches of government and not the Judiciary. *Id.* at 193, ¶ 13, 165 P.3d at 171. The court also explained there was "no North Star to guide a court in making such a determination; at best, we would be substituting our subjective judgment of what is reasonable under all the circumstances for that of the Board [of Regents] and Legislature, the very branches of government to which our Constitution entrusts this decision." *Id.* at 194, ¶ 21, 165 P.3d at 172.

¶ 28 The same is true here. Whether the Legislature has correctly determined, as Senate Bill 1612 states, "[t]he amounts [appropriated for Proposition 204 services] include[ ] all available sources of funding consistent with" the supplemental funding provision and has properly authorized AHCCCS to implement the enrollment freeze, presents a nonjusticiable political question. Further, because this controversy presents a nonjusticiable political question we do not address Petitioners' argument the Legislature's funding decision and the enrollment freeze constitutes an implied repeal of Proposition 204 in violation of the Voter Protection Act.

¶ 29 Our holding that this controversy involves a nonjusticiable political question does not constitute a determination the Legislature's AHCCCS appropriation and the resulting enrollment freeze complied with what the electorate directed by enacting Proposition 204; that determination would be " 'a decision on the merits that reflects the *exercise* of judicial review, rather than an abstention from judicial review.' " *Kromko*, 216 Ariz. at 195, ¶ 22, 165 P.3d at 173 (quoting *Forty–Seventh Legislature*, 213 Ariz. at 485, ¶ 7, 143 P.3d at 1026). While we recognize reasonable people may question whether, as the Legislature has said in S.B. 1612, its appropriation for Proposition 204 services actually "includes all available sources of funding," in light of the human suffering that has occurred and will unquestionably continue to occur as a consequence, under our system of governance, and in these circumstances, resolution of this issue is entrusted to the Legislature's judgment. Further, our decision does not mean the Legislature is free from Proposition 204. We hold only that we cannot review whether it has, in fact, appropriated "any other available sources" of supplemental funding and therefore cannot resolve this particular controversy.

## CONCLUSION

¶ 30 For the foregoing reasons, we affirm the result reached—but not all of the analysis used—by the superior court. Thus, we affirm the superior court's judgment denying Petitioners' request for relief.

CONCURRING: MICHAEL J. BROWN, Presiding Judge and PHILIP HALL, Judge.