295 P.3d 440

**CAVE CREEK UNIFIED SCHOOL DISTRICT; Casa Grande Elementary School District; Crane Elementary School District; Palominas Elementary School District; Yuma Union High School District; Arizona Education Association; Arizona School Boards Association; Scott Holcomb; Frank Hunter; and Nancy Putnam, Plaintiffs/Appellants,**

v.

**Doug DUCEY, in his capacity as State Treasurer; and State of Arizona, Defendants/Appellees.**

No. 1 CA–CV 11–0256.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 15, 2013.

LaSota & Peters PLC By Donald M. Peters and Kristin M. Mackin, and Arizona Center for Law in the Public Interest By Timothy M. Hogan, Phoenix, Attorneys for Plaintiffs/Appellants.

Thomas C. Horne, Arizona Attorney General By Kathleen P. Sweeney, Kevin D. Ray, and Jinju Park Hurtado, Assistant Attorneys General, Phoenix, Attorneys for Defendants/Appellees.

Office of the President, Arizona State Senate By Gregrey G. Jernigan, and Office of the Speaker, Arizona House of Representatives By Peter A. Gentala, Phoenix, Attorneys for Statutory Participants.

## OPINION

BROWN, Judge.

¶ 1 In this opinion, we address whether a statute approved by Arizona's voters in 2000, as part of Proposition 301, creates a binding obligation on the legislature to implement specific inflation adjustments to the annual budget for K–12 schools. *See* Arizona Revised Statutes ("A.R.S.") section 15–901.01 (2012) (stating that "the legislature shall increase the base level or other components of the revenue control limit"). For reasons explained below, we hold that § 15–901.01 requires the legislature to provide for annual inflationary increases in each component of the revenue control limit, including the base level. We also conclude that to the extent the legislature may view § 15–901.01 as permitting fewer increases, such an interpretation would violate the Voter Protection Act ("VPA") of the Arizona Constitution, which generally prohibits the legislature from changing voter-approved measures. Ariz. Const. art. 4, pt. 1, § 1(6)(B).

## BACKGROUND

¶ 2 In June 2000, the legislature convened in a special session and adopted Senate Bill 1007 ("S.B. 1007"), which (1) proposed a .6% sales tax hike to provide additional funding for public educational institutions and (2) imposed financial and academic accountability requirements on K–12 schools. *See generally* S.B. 1007, 2000 Ariz. Sess. Laws, ch. 1 (5th Spec. Sess.). The legislature determined that certain portions of S.B. 1007, including the inflation adjustment provision at issue

here, would become effective only if approved by the voters:

If approved by the qualified electors voting at a statewide general election, for fiscal years 2001–2002 through 2005–2006, the legislature shall increase the base level *or* other components of the revenue control limit by two percent. For fiscal year 2006–2007 and each fiscal year thereafter, the legislature shall increase the base level *or* other components of the revenue control limit by a minimum growth rate of either two percent or the change in the GDP price deflator, ... whichever is less, except that the base level shall never be reduced below the base level established for fiscal year 2001–2002.[1]

A.R.S. § 15–901.01 (emphasis added). Thus, S.B. 1007 directed the secretary of state to submit § 15–901.01 to the voters, along with several other statutory amendments. S.B. 1007 at § 64. The bill stated as follows: "[t]he secretary of state shall place on the ballot of the 2000 state general election the issue of ... [i]nflation adjustments in the state aid to education base level *and* other components of the revenue control limit pursuant to 15–901.01, ... as added by this act." *Id.* (emphasis added).

¶ 3 The measure was then placed on the ballot as Proposition 301. Ariz. Sec'y of State, Ballot Propositions and Judicial Performance Review for the 2000 General Election, Proposition 301 (Sept. 2000) ("Proposition 301 Publicity Pamphlet").[2] The full text of the proposed statutory amendments was included in the Proposition 301 Publicity Pamphlet, together with analysis by the Leg-

---

1. Funding for Arizona's public schools is governed by a complex statutory formula. *See* A.R.S. §§ 15–941 to –945 (2012). (This opinion cites the current version of statutes unless they have materially changed since the conduct at issue.) The "revenue control limit" is a portion of the formula used to provide equalization assistance to school districts. *See* A.R.S. § 15–901(A)(12) (2012). The base level is a dollar amount that is multiplied by a weighted student count and other factors to determine the base support level for each school district. *See* A.R.S. § 15–901(B)(2) (2012). For purposes of addressing the issues in this opinion, the revenue control limit currently consists of the base level and the transportation revenue control limit. *See* A.R.S. § 15–901(A)(12).

2. The ballot provided in relevant part as follows:

A "yes" vote has the effect of approving an increase in the state transaction privilege (sales) tax and the state use tax of six-tenths of one per cent to raise revenues in support of education, a state income tax credit in mitigation of those tax increases, *inflation adjustments in state aid for education,* a termination of an exemption from education funding revenue control limits for excess utility costs and a limitation on the school district qualifying tax rates and the county equalization assistance for education rate.

Proposition 301 Publicity Pamphlet (emphasis added).

islative Council and arguments for and against the measure. *Id.* As relevant to the inflation adjustment, the Legislative Council analysis stated: "If Proposition 301 passes, state general fund expenditures would be an additional $94.5 million in 2002, increasing annually thereafter. These additional expenditures would not be paid for from the increase in the sales tax." *Id.* at 172. The analysis explained further that the measure to be voted on would provide for "[a]utomatic inflation adjustments in the state aid to education base level or other components of a school district's revenue control limit." *Id.*

¶ 4 The voters approved Proposition 301 and in each subsequent budget year the legislature made inflation adjustments to both the base level and the transportation support level (the only "other component" existing at the time). The legislature's budget for fiscal year 2010–2011 ("H.B. 2008") adopted in March 2010, however, included an inflation adjustment only for the transportation support level.[3] Ariz. State Senate, Fact Sheet for H.B. 2008/S.B. 1008, provision 1 (7th Spec. Sess. 2010).

¶ 5 In October 2010, several school districts and three individuals ("Appellants") filed a complaint in the superior court naming the State Treasurer and State of Arizona as defendants ("the State"). Seeking a declaratory judgment, Appellants alleged that § 15–901.01, as a referendum protected under the VPA, requires the legislature to increase both the base level and the "other components" of the revenue control limit annually for inflation. Appellants further alleged that the legislature violated the VPA because its failure to adjust the base level amounted to an effective amendment of the statute and because it redirected funds allo-

cated for the specific purpose of making the inflation adjustments.[4]

¶ 6 The State moved to dismiss the complaint for lack of standing and failure to state a claim. In doing so, the State conceded the inflation adjustment included in § 15–901.01 "applies to the base level *and* other components of the revenue control limit." The State also conceded the statute was a referendum protected by the VPA, but maintained that H.B. 2008 did not violate the VPA because it did not expressly repeal or amend § 15–901.01 or divert funds allocated for any specific purpose. Pursuant to A.R.S. § 12–1841 (2012), the Speaker of the House of Representatives and the Senate President ("the Legislators") filed memoranda in support of the State's motion to dismiss, but did not seek to intervene. Consistent with their arguments on appeal, they asserted that § 15–901.01 is not protected by the VPA because it was not a referendum. The Legislators also asserted the use of the word "or" in § 15–901.01 gives the legislature a choice to adjust either the base level, the "other components" of the revenue control limit, or all of the components. They argued further that looking to legislative history would be unnecessary and inappropriate.

¶ 7 Following oral argument, the superior court granted the State's motion, finding that Appellants had standing but did not meet the "legal prerequisites for recovery." The court explained that although the voters' intention was to have an annual appropriation of funds made to protect schools from the effects of inflation, § 15–901.01 is not self-executing. Noting that the statute is "precatory, not mandatory," the court concluded that "the voters cannot require the legislature to enact a law that provides for that appropriation."

---

**3.** The legislature also chose not to adjust the base level for the 2011–2012 or 2012–2013 fiscal years. *See* A.R.S. § 15–901(B)(2)(c) (2012); *see also* Ariz. State Senate, Fact Sheet for S.B. 1617 (1st Reg.Sess.2011); Ariz. State Senate, Fact Sheet for S.B. 1529 (2nd Reg.Sess.2012).

**4.** Citing A.R.S. § 35–213 (2012) (establishing private right of action to enjoin illegal payment of public funds), Appellants requested that the State Treasurer be enjoined from making disbursements under H.B. 2008. Appellants' amended

complaint also requested "an order in the nature of mandamus" requiring the State Treasurer to disburse funds that include the inflation adjustment. We do not address these claims, as Appellants have not raised them on appeal. Our analysis is limited to reviewing Appellants' request for a declaratory judgment, and we express no opinion regarding the propriety of the mandamus or injunctive relief requested in the superior court. Additionally, for convenience we refer to the amended complaint as "the complaint."

The court entered judgment in favor of the State and this appeal followed.

## DISCUSSION

 ¶ 8 Appellants challenge the superior court's dismissal of their complaint, asserting that (1) Proposition 301, through § 15–901.01, "directed, in mandatory language, that specific appropriation of funds be made each year;" (2) § 15–901.01 requires inflation adjustments to *all* components of the revenue control limit; and (3) the legislature's failure to adhere to that requirement, by adopting H.B. 2008, violates the VPA.[5] Because these issues involve pure questions of law involving statutory and constitutional provisions, our review is de novo. *Prince v. City of Apache Junction*, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996).

 ¶ 9 Adopted in 1998, the VPA arose out of concerns "the legislature was abusing its power to amend and repeal voter-endorsed measures." *Ariz. Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 469, ¶ 7, 212 P.3d 805, 807 (2009) (citation omitted). The VPA therefore prohibits the legislature from repealing initiatives or referenda passed by a majority of the voters voting on the measure. Ariz. Const. art. 4, pt. 1, §§ 1(6)(B)-(D), (14). As a further limitation, the VPA prevents the legislature from amending voter-approved measures "unless the amending legislation furthers the purposes of such measure and at least three-fourths of the members of each house of the legislature ... vote to amend such measure." *Id.* at (6)(C). Thus, the principal purpose of the VPA is to preclude the legislature from overriding the intent of the people. *See Ariz. Early Childhood Dev.*, 221 Ariz. at 469, ¶ 7, 212 P.3d at 807 (citing Ariz. Sec'y of State 1998 Publicity Pamphlet at 47–48 (Arguments for Proposition 105)). With the adoption of the VPA, voter-approved measures are now superior to enactments of the legislature in that they cannot be repealed by legislative act, and they cannot be easily amended. *See* Ariz. Const. art. 4, pt. 1, §§ 1(6)(B)-(C).

 ¶ 10 As a threshold issue, the Legislators argue that Proposition 301 was not a referendum and thus not subject to the VPA because S.B. 1007 directed the legislature to submit "issues" rather than specific statutory language and was not initiated by the legislature as a concurrent resolution. Through the Arizona Constitution, the people have delegated general lawmaking authority for the state to the legislature:

> The legislative authority of the state shall be vested in the legislature, consisting of a senate and a house of representatives, but the people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any act, or item, section, or part of any act, of the legislature.

*See* Ariz. Const. art. 4, pt. 1, § 1(1). However, the people have reserved to themselves the power to propose amendments to the constitution and laws through the rights of initiative and referendum. *See id.* at (1)-(3). Through the referendum power, the legislature may submit to the people for approval "any measure, or item, section, or part of any measure." *Id.* at (3). The only two avenues for enacting voter-approved legislation are through an initiative or a referendum. *See id.* at (2), (3). In addition, nothing in the Arizona Constitution requires any specific language or procedure in submitting a pro-

---

5. This appeal could be deemed moot because Appellants' challenge relates specifically to the state budget enacted for fiscal year 2010–2011. *See Reinhold v. Bd. of Supervisors of Navajo County*, 139 Ariz. 227, 229, 677 P.2d 1335, 1337 (App.1984) (noting that "the specific relief requested (to provide funding for the fiscal year 1980–81) has now become moot by the passage of time."). Nonetheless, both the State and Appellants urge us to consider the appeal on its merits because the issues are of significant public importance and are capable of repetition yet evading review. *See Phoenix Newspapers, Inc. v. Molera*, 200 Ariz. 457, 460, ¶ 12, 27 P.3d 814, 817 (App.2001). We agree and therefore decline to apply the mootness doctrine. *See Wise v. First Nat. Bank*, 49 Ariz. 146, 149, 65 P.2d 1154, 1156 (1937) (declining to find an appeal moot because the legal principles at issue could be raised annually in subsequent litigation and affect future budgetary considerations.)

posed law to the people. *See id.* Thus, we conclude that Proposition 301 is subject to the provisions of the VPA.

## A. Mandatory Obligation to Fund Inflation Adjustment[6]

 ¶ 11 Section 15–901.01 provides that "the legislature *shall* increase the base level or other components of the revenue control limit by a minimum growth rate of either two per cent or the change in the GDP price deflator, ... whichever is less." (Emphasis added.) When construing a statute adopted by referendum, "[o]ur primary objective ... is to give effect to the intent of the electorate." *See State v. Gomez,* 212 Ariz. 55, 57, ¶ 11, 127 P.3d 873, 875 (2006). Generally, we find the best indication of intent in the plain language of the statute and we will typically not look beyond it when the language is clear and unambiguous. *Mathews ex rel. Mathews v. Life Care Ctrs. of Am., Inc.,* 217 Ariz. 606, 608, ¶ 6, 177 P.3d 867, 869 (App.2008).

¶ 12 In *Fogliano v. Brain,* we addressed an issue similar to the one we face here. 229 Ariz. 12, 270 P.3d 839 (App.2011). *Fogliano* involved Proposition 204, an initiative the voters approved in the 2000 general election that amended various statutes relating to the Arizona Health Care Cost Containment System ("AHCCCS") to "substantially expand the number of people 'eligible' to receive health care subsidized by state, county, and federal funds." *Id.* at 14, ¶ 2, 270 P.3d at 841. Proposition 204 specified a funding source for the AHCCCS expansion, but also provided, "[t]o ensure that sufficient monies are available to provide benefits to all persons who are eligible," the fund "shall be supplemented, as necessary, by any other available sources including legislative appropriations and federal monies." *Id.* at 15, ¶ 2, 270 P.3d at 842 (internal quotations and citation omitted).

¶ 13 We looked to the language of the statute, which includes mandatory directives such as the word "shall," and concluded that the supplemental funding provision means what it says. *Id.* at 18–19, ¶¶ 18–21, 270 P.3d at 845–46. We therefore disagreed with the superior court's conclusion that Proposition 204 "merely contemplates that the Legislature will pass legislation to fund the program." *Id.* at 18, ¶ 16, 270 P.3d at 845. Notwithstanding the legislature's obligation to fund the program, we ultimately concluded that whether the legislature had appropriated "any other available sources" of funding presented a non-justiciable political question. *Id.* at 19–20, ¶ 22, 270 P.3d at 846–47.

¶ 14 Similar to the statute at issue in *Fogliano,* § 15–901.01 provides that the legislature "shall increase the base level or other components of the revenue control limit." The statute also limits the legislature's discretion on the measure of the adjustment it must make, giving the legislature the narrow option of raising the components of the revenue control limit by "either two per cent or the change in the GDP price deflator, ... whichever is less." *Id.* Therefore, consistent with our reasoning in *Fogliano,* we hold that § 15–901.01 constitutes a mandatory directive to the legislature to fund the inflationary increase provision.

¶ 15 The State and the Legislators argue that notwithstanding the statute's mandatory language, the people do not have the power to bind the legislature's future exercise of its power and discretion. They recognize the concurrent right to legislate under the constitution, but contend that the voters cannot make laws that order future legislatures to pass laws or make appropriations. These arguments are not supported by relevant authority and fail to give proper recognition to the significance of the VPA.[7] *See supra* ¶¶ 9–10; *see also Ariz. Early Childhood Dev.,* 221 Ariz. at 469, ¶ 7, 212 P.3d at 807

---

6. The superior court determined that § 15–901.01 is not an appropriation, reasoning that the language of the statute does not directly set aside any particular sum. Regardless of whether § 15–901.01 constitutes an actual appropriation, this case hinges on whether the voter-approved statute requires the legislature to follow the statutory provisions.

7. All of the authorities cited by the State and the Legislators regarding the ability of voters to bind the legislature were decided before adoption of the VPA.

(recognizing that "[t]he Voter Protection Act altered the balance of power between the electorate and the legislature").

¶ 16 The State also asserts that while the people can by *constitutional* amendment properly direct the legislature to exercise its discretion in a particular manner, the voters cannot do so through a *statutory* provision enacted by initiative or referendum. The State relies solely on *Hernandez v. Frohmiller*, 68 Ariz. 242, 204 P.2d 854 (1949) in support of its position. In *Hernandez*, our supreme court held that a statute enacted by initiative was unconstitutional for various reasons, including indefiniteness and because it violated separation of powers principles. *Id.* at 259, 204 P.2d at 865–66. The court also stated that a section of the act directing "the legislature to appropriate not less than 1% of the payroll of the state's service ... means nothing ... [and] is a waste of printer's ink." *Id.* at 253–54, 204 P.2d at 862. The court added that "[i]t is the constitutional duty of the legislature without specific direction to make all necessary appropriations to pay the expenses of state agencies. There is no legal method of compelling the legislature to act." *Id.*

¶ 17 The State believes this language in *Hernandez* is controlling; however, we simply read it to mean that because the legislature was already compelled by the constitution to pay the salaries of state workers, it was unnecessary for the statute to require the legislature to do so. This is not the case here, where Proposition 301 imposed a new obligation on the legislature and did not merely attempt to compel the legislature to perform a pre-existing duty. Furthermore, in *Ariz. Early Childhood Dev.*, our supreme court determined that a *statutory* provision adopted by *initiative* prohibited the legislature from using the funds contrary to the purpose of the initiative. 221 Ariz. at 469, 212 P.3d at 807.

¶ 18 The State argues further that although the VPA "may impact the choices" the legislature can make in exercising its legislative discretion, the VPA cannot "restrict" legislative discretion. This is a distinction without legal significance. The legislature is either required to follow the will of the people as expressed through the powers of initiative and referendum, or it is not; there is no middle ground as it relates to § 15–901.01. *See Ariz. Early Childhood Dev.*, 221 Ariz. at 469, ¶ 6, 212 P.3d at 807 (explaining that the VPA "limits the legislature's authority ... to divert or appropriate funds 'created or allocated to a specific purpose' by such measures." (citation omitted)). Accepting the State's argument would render the statute meaningless, because the legislature could ignore the inflation adjustment provision altogether, reasoning that a zero percent increase falls within its "legislative discretion." Even the Legislators acknowledge they are bound to fund at least one component of the revenue control limit. Because we conclude that the VPA requires the legislature to follow the electorate's decision to approve § 15–901.01, we reject the argument that the people do not have the power to bind the legislature. *See Ariz. Early Childhood Dev.*, 221 Ariz. at 470, ¶ 11, 212 P.3d at 808 (concluding that the legislature's decision to sweep interest income into the general fund did not further the purposes of the Early Childhood Initiative and therefore violated the VPA).

¶ 19 Moreover, it would be illogical to conclude that the legislature may ask the voters to approve § 15–901.01, and then disregard their decision. This statutory provision was not foisted upon the legislature by the people—the legislature itself drafted this measure and submitted it to the voters. Presumably the legislature knew that bestowing this statute with the status of a referendum would come with heightened consequences under the VPA.[8] *See Bunker's Glass Co. v.*

8. In 2004, the legislature placed Proposition 101 on the ballot and it was approved by the voters. The purpose of the proposition was to amend the Arizona Constitution to require that any initiative or referendum requiring a "mandatory expenditure of state revenues for any purpose ... or [that] allocates funding for any specific purpose" must also include a dedicated funding source other than the general fund. Ariz. Sec'y of State, Ballot Propositions and Judicial Performance Review for the 2004 General Election, Proposition 101, Legislative Counsel Analysis (Sept. 2004). Proposition 101, known as the Revenue Source Rule, does not apply here because it was passed

*Pilkington plc,* 202 Ariz. 481, 489, ¶ 32, 47 P.3d 1119, 1127 (App.2002) (recognizing that courts presume the legislature is aware of existing law when it passes legislation).

## B. Extent of the Legislature's Obligation

■ ¶ 20 We now turn to deciding how far the legislature's obligation extends. Appellants argue the plain language of the statute offers an irrational choice: increase either the base level or "other components," but not all components. Therefore, they assert that we must look to the legislative and electoral history of the statute showing that "or" must be interpreted to mean "and." In the superior court and on appeal, the State has conceded this point. The Legislators, on the other hand, argue the plain language of the statute requires us to read "or" as allowing a choice of increasing *at least one* of the components of the revenue control limit.

■ ¶ 21 We recognize our primary goal in construing a statute is to give effect to legislative intent and that the plain language is usually the best indicator of such intent. *See supra* ¶ 11. However, Appellants and the State agree that the intent of the legislature and the electorate regarding § 15–901.01 is not represented in the plain language of the statute. It is "well established that even where statutory language is clear and unambiguous, we will not employ a plain meaning interpretation [that] would lead to ... a result at odds with the legislature's intent." *State v. Estrada,* 201 Ariz. 247, 251, ¶ 19, 34 P.3d 356, 360 (2001) (internal quotations and citation omitted). Given these considerations, we find it necessary to look beyond the text of the statute. A review of the background, purpose, and implementation of Proposition 301 leads us to conclude that requiring the legislature to increase all components of the revenue control limit is necessary because a contrary holding would con-

tradict the intent of the legislature that drafted the provision and the voters who approved it. *See id.* at 252, ¶¶ 23–24, 34 P.3d at 361.

¶ 22 First, allowing the legislature to choose between increasing the base level or "other components" would be inconsistent with the legislature's own calculation of the costs associated with the measure. The Legislative Council analysis of Proposition 301 stated the cost of the measure would be "$94.5 million in 2002, increasing annually thereafter." Proposition 301 Publicity Pamphlet at 172. At the Legislative Council meeting discussing Proposition 301, staff from the Joint Legislative Budget Committee ("JLBC") explained that of the "$94 million, $66.8 million is from the 2 percent adjustment." Minutes of Ariz. Leg. Council, 44th Leg., 2d Reg. Sess. at 7 (Ariz. July 6, 2000). However, an increase in just the transportation component of the revenue control limit would only account for roughly $2.6 million of that amount. Ariz. Dep't of Educ. Fiscal Year 2002 and 2003 Appropriations Report at 198 ("Education Department Report"). The Legislative Council clearly contemplated that the annual inflation adjustment would include an adjustment to the base level.

¶ 23 Second, the Senate Fact Sheet for S.B. 1007 referred to the measure as "adjusting the state aid to education base levels for inflation" and stated the measure "[r]equires the Legislature to increase the base level annually by two percent or the inflation rate, whichever is less." Ariz. State Senate, Corrected, Final Revised Senate Fact Sheet: S.B. 1007, ¶¶ 1, 41 (5th Spec. Sess. 2000). This description is consistent with the initial version of the bill as it was introduced in and engrossed by the Senate, which included the inflation adjustment mandate in the definition of "base level." S.B. 1007 (introduced and engrossed versions).[9]

four years after Proposition 301 was approved. Based on its plain language, however, this constitutional amendment recognizes the authority of the voters to require the legislature to expend state revenues or to allocate funds for certain purposes.

**9.** The chaptered House version of the bill shows that the inflation adjustment provision was cop-

ied verbatim and moved to its own section, which provided for the enactment of § 15–901.01. *See* 2000 Ariz. Sess. Laws ch. 1, § 11. This "copy and paste" from the base level definition may explain why the language of the statute separates out the components, rather than simply providing for an adjustment to the entire revenue control limit.

¶ 24 Third, the legislature instructed the Secretary of State in S.B. 1007 to include on the ballot "the issue of . . . [i]nflation adjustments in the state aid to education base level and other components of the revenue control limit pursuant to 15–901.01, . . . as added by this act." S.B. 1007 at § 64(A)(2). This language indicates the legislature understood the proposed language in § 15–901.01 to require an increase to all components. *Cf. Willis v. United States,* 719 F.2d 608, 612 (2d Cir.1983) ("Why the draftsman chose to use "or" in the bill, as distinguished from the crystal clear "and" of the committee reports, is indeed beyond our ken.").[10]

¶ 25 Fourth, our interpretation is consistent with the purpose of Proposition 301 as communicated to the people of Arizona in the publicity pamphlet and on the ballot. *See Ariz. Early Childhood Dev.,* 221 Ariz. at 469, 471, ¶¶ 7, 14, 212 P.3d at 807, 809 (examining supporting materials like publicity pamphlets to determine purpose). The arguments in favor of Proposition 301 included statements that Arizona "lags behind most states" in education funding and that the purpose of Proposition 301 was to "lift Arizona up" and raise "per pupil funding." Proposition 301 Publicity Pamphlet at 172–73. Further, the ballot described that "a 'yes' vote has the effect of approving . . . *inflation adjustments* in state aid for education." *Id.* at 183 (emphasis added). These statements support the legislature's apparent understanding that education funding would be adjusted to keep pace with the cost of living.

¶ 26 Finally, our construction of the statute is consistent with Arizona Attorney General Opinion No. I01–020 (2001). *See Ruiz v. Hull,* 191 Ariz. 441, 449, ¶ 28, 957 P.2d 984, 992 (1998) (stating, although they are not binding, "reasoned opinion[s] of a state attorney general should be accorded respectful consideration"). The opinion, requested by a member of the Arizona Senate, addressed issues related to Proposition 301, including what inflation adjustments it required. Op. Ariz. Att'y Gen. I01–020. The attorney general opined that reading "or" as "and" was consistent with the statute's history and purpose. *Id.* at 6–7.

¶ 27 Consistent with Opinion No. I01–020, the legislature treated the statute as requiring the funding of all components of the revenue control limit until 2010.[11] The Education Department Report prepared by the JLBC stated that "Proposition 301 mandates the 2% deflator[.]" Education Department Report at 198. And even though the report included the statutory language "base level or other components," the JLBC construed that language as requiring "a 2% increase in the formula funding 'base level' amount." *Id.* at 197–98. In addition, the JLBC applied the 2% adjustment to both the base level and the transportation support level in its projections through budget year 2010–2011 and stated "the Legislature is required to increase *those* components[.]" *Id.* at 182–83 (emphasis added).

¶ 28 If we were to adopt the construction the Legislators urge, the legislature could easily undermine the purpose of the measure

---

10. The inartful drafting of § 15–901.01 is also apparent from the legislature's inclusion of the concluding phrase "except that the base level shall never be reduced below the base level established for fiscal year 2001–2002." In an earlier version of S.B. 1007, the "except that" phrase was preceded by the following: "The Legislature may override this requirement by passing a concurrent resolution that is approved by at least two-thirds of the members of each house of the legislature[.]" S.B. 1007 at § 5(B)(h) (introduced version). In the final version of the bill, however, the legislative override language had been removed. Thus, the "except that" phrase in the current statute does not appear to have any legitimate purpose, as setting the base level at or below the amount established for the 2001–2002 fiscal year would contradict

the obvious purpose of the statute—to provide annual inflationary increases.

11. According to the committee minutes, prior to H.B. 2008's passage by the House of Representatives' Rules Committee on March 9, 2010, committee counsel Tim Fleming stated that the bill was "constitutional and in proper form." Minutes of House Comm. on Rules, 49th Leg., 7th Spec. Sess. (Ariz. Mar. 9, 2010). But he also "identified an issue about choice with regard to funding certain components of the education formula and Prop 301." *Id.* He acknowledged that "'or' may mean 'and[,]' which would mean the Legislature must fund both components." *Id.* He added further, "now only one is being funded" and "HB2008 is subject to legal interpretation." *Id.*

while still complying with its express terms. For instance, the legislature could continue indefinitely to increase only the transportation control limit and leave the base level unchanged, thereby gradually and significantly reducing the buying power of schools over time. It could also comply with the statute by increasing the base level while at the same time leaving the transportation control limit unchanged and shrinking K–12 transportation funding in real dollars. The legislature could further diminish the funding by creating a new component, funding it at an insignificant level, and then keeping the base level and transportation control limits at their existing levels year after year. Taking such actions would directly contravene what the voters intended when they approved the legislature's adoption of § 15–901.01. *See Estrada*, 201 Ariz. at 252, ¶ 24, 34 P.3d at 361 (declining to construe a voter-enacted statute in a manner that "would permit the State to circumvent the manifest purpose of the statute").

¶ 29 Therefore, given the State's concession and the purpose, history, and past legislative treatment of § 15–901.01, we hold that the intent of the statute is to require the legislature to adjust all components of the revenue control limit. *See Calik v. Kongable*, 195 Ariz. 496, 501, ¶ 20, 990 P.2d 1055, 1060 (1999) ("Courts should avoid hypertechnical constructions that frustrate legislative intent." (internal quotations and citations omitted)); *see also De Sylva v. Ballentine*, 351 U.S. 570, 573, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) ("[T]he word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity. That trouble with the word has been with us for a long time[.]"); *Hurt v. Superior Court*, 124 Ariz. 45, 50, 601 P.2d 1329, 1334 (1979) (finding that the statutory phrase "children or parents" should be interpreted in the conjunctive rather than the disjunctive); *Shumway v. Farley*, 68 Ariz. 159, 165, 203 P.2d 507, 511 (1949) ("It is a well-established rule that a court may in the interpretation of statutes, where ambiguity exists or the statute [cannot] otherwise be harmonized, give effect to the legislative intent by interchanging the words 'or' and 'and.'" (ci-

tation omitted)). Neither the State nor the Legislators direct us to any legislative or voter history supporting the notion that Arizona's voters intended to permit the legislature to choose which component it would adjust for inflation. Instead, all the history points to the contrary.

## C. Consistency With the VPA

¶ 30 Appellants argue that because the legislature failed to give effect to all of the provisions of § 15–901.01 in its budget enactment, it has effectively amended the statute in violation of the VPA. Our supreme court has recognized that "the legislature may not do indirectly what it is prohibited from doing directly." *Caldwell v. Bd. of Regents*, 54 Ariz. 404, 410, 96 P.2d 401, 403 (1939). Thus, to violate the VPA, a legislative action need not take the form of a bill which expressly purports to amend or revise a statute; rather, the primary inquiry is whether the action adds to or takes away from the voter-approved law. *See id.* (examining the "purpose and probable effect" of a legislative act in determining whether it violated the constitution).

¶ 31 Appellants ask us to find that the legislature's decision to eliminate the inflation adjustment requirement for the base level component of the revenue control limit constitutes an amendment of a voter-approved statute and thus conclude that H.B. 2008 violates the VPA. We decline to make that determination, however, because what we say now has no bearing on what occurred in relation to the funds that were spent under the state's budget for fiscal year 2010–2011. *See supra* note 5. Instead, we simply recognize that in recent years the legislature has been operating under a mistaken interpretation of its responsibilities under § 15–901.01. However, any future legislative act that fails to adhere to the requirements of § 15–901.01 as articulated here would risk violating the VPA as an effective repeal or amendment of the statute. We presume the legislature acts constitutionally and will undoubtedly draft future enactments so as to avoid any such conflict. *See Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982) (noting the presump-

tion that statutes are constitutional); *McMann v. City of Tucson,* 202 Ariz. 468, 471, ¶ 8, 47 P.3d 672, 675 (App.2002) (recognizing that courts presume the legislature intended acts with a constitutional purpose).

¶ 32 Without question, the legislature faces substantial challenges in preparing the state's budget, particularly during difficult economic circumstances. But our constitution does not permit the legislature to change the meaning of voter-approved statutes by shifting funds to meet other budgeting priorities. *See Ariz. Early Childhood Dev.,* 221 Ariz. at 471, ¶ 15, 212 P.3d at 809. Absent an amendment or repeal of § 15–901.01 by the voters, the legislature is bound by the VPA to give full effect to the statute's requirements. *Crawford v. Hunt,* 41 Ariz. 229, 243, 17 P.2d 802, 807 (1932) ("[C]onstitutional provisions are to be construed liberally in order to carry out the purposes for which they were obviously adopted.").

#### D. Attorneys' Fees

¶ 33 Appellants request attorneys' fees on appeal pursuant to A.R.S. § 35–213 (2012) and the private attorney general doctrine. Because compliance with § 35–213 has not been raised as an issue on appeal, *supra* note 4, we do not consider whether a fee award would be proper under that statute.

¶ 34 The purpose of the private attorney general doctrine is "to promote vindication of important public rights." *Arnold v. Ariz. Dep't of Health Servs.,* 160 Ariz. 593, 609, 775 P.2d 521, 537 (1989) (internal quotations and citation omitted). The doctrine "is an equitable rule which permits courts in their discretion to award attorneys' fees to a party who has vindicated a right that: (1) benefits a large number of people; (2) requires private enforcement; and (3) is of societal importance." *Id.* (internal quotations and citations omitted). Applying these factors, we conclude that a fee award is appropriate in this case.

¶ 35 First, because the resolution of this litigation affects funding for Arizona's public education, it necessarily benefits a large number of people. Second, absent private

enforcement, the legislature may have continued to operate under its erroneous interpretation of § 15–901.01. *See Ariz. Cntr. for Law in Pub. Interest v. Hassell,* 172 Ariz. 356, 371, 837 P.2d 158, 173 (App.1991) (stating that when vindication of a right directly challenges a statutory enactment, the right can only be privately enforced). Third, it is undeniable that funding for public education, and particularly K–12 schools, has continual importance in this state. *See, e.g.,* Proposition 301 Publicity Pamphlet at 176, 182 (arguments for and against Proposition 301 recognizing the need to "provide more funding to public schools" and that "it is essential that we fund our children's education at an appropriate level").

¶ 36 We therefore grant Appellants' request for reasonable attorneys' fees incurred on appeal upon their compliance with Arizona Rule of Civil Appellate Procedure 21.

#### CONCLUSION

¶ 37 For the foregoing reasons, we hold that A.R.S. § 15–901.01 requires the legislature to provide for annual inflationary adjustments of all components of the revenue control limit as provided in the statute. We therefore reverse the superior court's ruling dismissing Appellants' complaint and remand for entry of a declaratory judgment in favor of Appellants consistent with this decision.

CONCURRING: PETER B. SWANN, Presiding Judge and JON W. THOMPSON, Judge.